LEE R. GLOVER,

*Plaintiff and Respondent,*

vs.

JOHN BERGER,

*Defendant and Appellant.*

(No. 2614; November 17th, 1953; 263 Pac. (2d) 498).

222

For the defendant and appellant the cause was submitted upon the brief of R. G. Diefenderfer of Sheridan, Wyoming; H. F. Fellows of Rapid City, South Dakota; and Lem Overpeck of Belle Fourche, South Dakota, and oral argument by Mr. Diefenderfer.

For the plaintiff and respondent the cause was submitted upon the brief of Anderson & Morgan of Gillette, Wyoming, and Maurer & Garst of Douglas, Wyoming, and oral argument by Mr. Garst.

## OPINION

RINER, Justice.

This is a direct appeal proceeding where this court is asked to review a record and judgment arriving here from Campbell County, wherein Lee R. Glover was plaintiff, respondent here, and John Berger was defendant, but now the appellant.

Plaintiff's petition was originally filed October 17, 1951, in Crook County, Wyoming, where the parties reside but was removed to Campbell County on change

of venue on the motion of the defendant and supported by his affidavit that he could not secure a fair trial in said county of Crook because, as alleged, "Plaintiff has undue influence over the citizens of that county." The order for this change of venue was not objected or excepted to by either of the parties aforesaid. Plaintiff's petition is in substance as follows: That on September 13, 1951, at defendant's home located north of Moorcroft in said Crook County the defendant maliciously and unlawfully committed an assault, and battery upon plaintiff by then and there firing two shots at plaintiff from a loaded rifle while plaintiff's hands were raised above his head, one of which shots struck plaintiff in his right forearm, passing through the same, lacerating the muscle and nerve tissue and fracturing the ulna.

That on account of the injury thus inflicted plaintiff was obliged to hire a car to transport him from Oshoto, Wyoming, (the name of the location near where he was hurt) to Sundance, Wyoming, and to there employ a physician to save his life; from Sundance he was obliged to hire additional transportation to a hospital at Hot Springs, South Dakota, in orde rto save his right forearm and hand, all to his damage in the sum of $200.00.

That due to this injury plaintiff was forced to undergo an operation in said last named hospital for the removal of bone splinters and mutilated nerve and muscle tissue during which time he suffered great mental distress and bodily pain to his damage in the sum of $25,000. That plaintiff is reliably informed, and so states, that it will be necessary for him to remain in said hospital for eight weeks; that for a year thereafter, he will be unable to pursue his usual and customary occupation; that during said year he will have to undergo another operation in order that said

forearm be further repaired and during all of which time plaintiff will not have the free use of his right arm and hand but will be required to employ help to do the work he would ordinarily do himself to his damage in the sum of $5,000. That plaintiff upon reliable information states he will never have the free use of his right forearm and hand, but will be permanently crippled to his damage in the sum of $25,000. That in inflicting this injury upon plaintiff the defendant acted maliciously and was guilty of a wanton disregard of plaintiff's rights and feelings, for which plaintiff demands exemplary and punitive damages in the sum of $50,000.

It was prayed that he recover of the defendant $55,000 compensatory damages and $50,000 punitive damages.

The defendant for his answer to plaintiff's petition denied each allegation of that pleading. For a second defense he stated in substance that he admitted he shot plaintiff at the time and place alleged in plaintiff's petition and that without excuse or justification plaintiff and one Henry Boles, as aggressors, approached defendant at his home in a rude, insolent, angry, riotous and turbulent manner and by threatening language and conduct caused him to believe or to have reasonable grounds for believing that both he and Mae Baker, an employee of the defendant, were about to be assaulted, battered, injured or killed by the plaintiff and Henry Boles, and in defense of his person and that of Mae Baker, and in preventing and attempting to prevent the carrying out of any such assault, battery or killing, and with no more use of force or violence than was reasonably believed by him sufficient to so defend his person an dprevent such offense, he shot plaintiff. For a third defense plaintiff, as defendant avers, aggravated and provoked the shooting by his (plaintiff's)

threatening and offensive language, insults and conduct and by his challege of defendant to combat.

Plaintiff's reply to defendant's pleading was a denial of "each and every allegation of new matter in said answer contained."

It is stated in appellant's brief in this court, and it is not denied, that the District Judge while presiding in Crook County at the time the change of venue was applied for and granted, set certain cases for trial at Gillette, Wyoming, the county seat of Campbell County, to be heard before a jury in said county. Among these cases were the criminal case of State of Wyoming vs. John Berger, Defendant, and the civil case of Glover vs. Berger, in which this appeal is prosecuted. This, the Judge did, by letter sent to all counsel of record in said cases. These settings of cases for trial were made by the presiding Judge aforesaid in Sundance, the county seat of Crook County; the letter thus sent was of date October 3, 1952. This letter, above mentioned, also set for trial other cases which were designated to be heard following the disposition of the civil action in the Glover case. The criminal case aforesaid was designated to commence on Monday, October 27, 1952, at 9:30 a.m. while the Glover civil action case was set to be heard on Tuesday, October 28, 1952, at 1:30 p.m. to follow the conclusion of the criminal action. The jury in the criminal action returned a verdict against the defendant, Berger, of guilty of the crime of assault and battery, although the State had charged Berger in the criminal case aforesaid with the crime of assault and battery with intent to murder Glover. Before the verdict in the criminal case was returned into court the trial judge requested the remainder of the jury panel, not engaged in hearing the criminal case aforesaid and consisting of some 23 persons, to withdraw from the courtroom until the verdict

in said criminal case had been received and the jury discharged. Thereafter it seems the civil case was called. The remaining portion of the jury panel was then brought back into the courtroom and a jury was selected therefrom to try the Glover civil case which concededly involved substantially the same facts as did the criminal action against Glover. It seems to be admitted that the remainder of the jury panel of 23 persons were not present in the courtroom and did not hear the verdict rendered in the criminal case.

Prior to the civil case being called for trial objections were, on October 18, 1952, filed on behalf of the defendant, Berger, to proceed with that trial on October 28, 1952, the date set therefor, on the ground that the defendant could not receive a fair trial because that part of the jury panel not hearing the criminal case would learn of those facts during the course of the criminal trial and request was made that the Glover civil case, which it was stated, would involve the presentation of the same facts as would be submitted in the criminal action be continued until the next jury term in Campbell County. To these objections, plaintiff, Glover, filed a "resistance" setting out that plaintiff has already prepared for trial twice at a cost of upwards of $350; that if the trial of said cause should be continued it will be more than two years before another hearing of the Glover civil case could be heard and plaintiff will lose the benefit of his existing preparations for trial and be faced with a likelihood of losing important witnesses who were interviewed in the two previous preparations for trial because of their leaving the State of Wyoming. Again on October 28, after the civil case was called for trial counsel for defendant sought again orally for a continuance because of the rendition of the verdict in the criminal case and because a jury panel of only 23 persons were then avail-

able to try the Glover civil case. The plaintiff also orally resisted defendant's application for a continuance asserting that plaintiff was ready for trial; that the balance of the jury panel was without the courtroom; that the verdict was rendered in the criminal action; that the civil case had already been set twice for trial and the defendant had not offered to reimburse the plaintiff for his expenses incurred in the preparation for trial as required by statute, § 3-2002 W.C.S. 1945, which provides:

"Any court, for good cause shown, other than the absence of evidence, may continue any action at any stage of the proceedings, at the cost of the applicant, to be paid as the court shall direct."

These applications for a continuance, one written and the other oral, on behalf of the defendant, Berger, were denied by the court and the trial was proceeded with in the civil case resulting in a verdict for plaintiff in the sum of $15,000; $10,000 thereof as compensatory damages and $5,000 as punitive damages. Upon this verdict the court rendered the judgment, now appealed from, as mentioned above.

The facts of the instant case which we are permitted to consider (see Jacoby vs. The Town of the City of Gillette, 62 Wyo. 487, 494, 174 P. (2d) 505,) and cases cited therein, which have been consistently followed by this court in years past, as told by plaintiff and noncontradictory of other testimony on the witness stand, are substantially these:

Plaintiff testified that he is 32 years old, was born and raised in Crook County. That he knew John Berger and Henry Boles and also Mae Baker and her husband, Darryl Baker; that plaintiff is a rancher running about 2400 acres and about 27 head of cattle; that he has been on his ranch since he was a small boy; that he joined

the army in 1946 and was gone for four years; that he has been on the ranch ever since until the time of the shooting on September 13, 1951. On that day he was at John Berger's place having been asked to go there by Henry Boles. Mr. Boles is the foreman for Mrs. Fowler, the owner of the ranch and is a neighbor of Glover's. Her ranch is about three miles away from Glover's and about six to seven miles away from the Berger ranch. However, their lands adjoin in some places. Glover's lands adjoin both the Fowler and Berger places. It is about 5 to 5½ miles from Glover's to the Berger place. The reason he went down to the Berger place was because Henry Boles asked him to go with him to help drive some bulls back home that had gone upon the Berger place. Mr. Boles wanted Glover to help estimate the damages that had been inflicted on Mae Baker's bull by the other two animals. Mae Baker had been over to Mrs. Fowler's place and had asked that somebody be sent over to the Berger place to take care of and drive the two bulls home that had been attacking the animal belonging to her (Mae Baker). That on the way over the following morning to the Berger place to get the two bulls, one of which belonged to Mrs. Fowler and the other to a neighbor of her's and for whom she was taking care of the animal for a while, Glover and Boles met Mrs. Baker and went with her. They all three went to the Berger home. Boles asked Mrs. Baker where the bulls were and she told him they were in the Berger corral. Henry Boles, Glover and Mrs. Baker rode up to the Berger ranch buildings; all three of these persons were on horseback and they approached the buildings at a gallop. The horses were slowed down before they reached the buildings. Mrs. Baker did not ride up to the house with Boles and Glover. Berger was seen by Glover on the step in front of the door of the house; the door being closed behind him. As Boles and Glover approached the

house they were even with each other and Berger was standing on the porch of the house. As the two horsemen stopped Berger turned around and went in the house and he then came out immediately with his rifle in his hand. As he came toward the two horsemen he raised the rifle and started cusing them. When Berger stopped coming forward he was within 15 feet of Boles and Glover and kept swearing at them. Neither Glover nor Boles did any cursing. Neither Boles nor Glover said anything to Berger at that time. Then Berger turned toward Glover and asked him why he had come up there looking for trouble and Glover said he hadn't come looking for any trouble. As soon as Berger came out of the house with the rifle he told Glover and Boles to put their hands up. Both Boles and Glover had their hands in the air above their heads. Berger then fired three shots; the first time he shot at Glover and missed him; the second shot he fired hit Glover in the arm and he then swung the rifle toward Henry Boles and shot at him. At the time the shot occurred both Boles and Glover were on their horses. Mae Baker then came to Berger and told him to quit shooting and that he had hit Glover in the arm and that Glover should get that arm fixed. That after the shooting had occurred Berger told Glover to go down the road and go home and Glover started to do that. Mrs. Baker met Glover a short distance from Berger's house; she had a piece of cloth with which she put a tourniquet on Glover's arm. Glover was taken by Mae Baker's husband to the Evans place near Oshoto; Mr. Evans took Mr. Glover from his place to the Oshoto store where he was put in a car and driven to Sundance. At Sundance he was attended to by Dr. Clarenbaugh. Glover was then taken by ambulance, with Dr. Clarenbaugh in attendance, to Hot Springs, South Dakota, where he went to the Veteran's Administration Center. All of the ranches above mentioned were in Crook County.

Neither Glover nor Boles were armed nor had any weapon of any kind with them.

Glover went to the hospital at Hot Springs on September 13, 1951, the day of the shooting. He was given leave of absence from time to time and then had to go back to the hospital. He was discharged finally from the hospital the latter part of April, 1952. He, Glover, remembers receiving all of the services that Dr. Brown testified to in the case. In the June following his discharge in April he returned to the hospital for examination. Glover testified that he had considerable pain while he was in the hospital. The pain began before he reached the hospital. The arm was very painful from Oshoto to Sundance; and he had considerable pain on the drive from Sundance to Hot Springs. At times the doctors would give him something which would help to ease the pains. At the end of December, 1951, Glover had undergone another operation. It was explained to him by the doctors in the Veterans Hospital that they were doing all that could be done for him but that the pain was something he would just have to bear. Glover stated he suffered and was extremely uncomfortable from the nerve operation performed on his arm. He also suffered mental distress while he was in the hospital saying he was a rancher and he was worried about his wife and children. He had no one at his ranch to take care of things. His wife was pregnant at that time and was in no condition to take care of the ranch and he just didn't know what to do at that time. He testified he had to have someone to take care of the ranch and he made an agreement with a friend named Fred Walker that if Fred would take care of the Glover's place for a year he, Glover, would agree to split the calf crop and all the proceeds from the place for the year. Walker took over the place about October 1, 1951. Previous to the shooting Glover had

practically all the time done his own work except at haying or threshing time. At threshing time he employed someone. Glover stated he had incurred an ambulance fee from Sundance to Hot Springs of $65.50, as shown by a bill from C. D. Roberts in Sundance. Dr. Clarenbaugh's bill for services was $50.00.

Glover made an agreement for the second year with Mr. Walker because he, Glover, didn't have the money to hire someone to take care of the place. Glover sold half his calf crop, 12 head, and received $868.00 for the animals. Walker got 12 calves also. It was agreed that Walker was to put the hay up himself that was raised on the Glover ranch. Walker got 20 tons of hay of the fair market value of $35.00 per ton. Walker had the grass on the Glover ranch for his calves and for some of his milch cows and the net income from the Glover ranch in 1950 was $2,060 and for 1951 it was $3,721. The average income to Glover for these two years was $2890. He had some income in 1952 from work by helping a man in Spearfish, South Dakota, work on a garage at 50 cents an hour. Glover stated no one would hire him because he was crippled but that this one man did hire him to help put the stucco wire on a garage. He worked for this man about two weeks and made about $20.00. Glover testified he learned to handle a truck and push and pull the levers without trying to grip them and he worked for Peter Kiewits on the truck job for about six weeks. Then they gave him a job of picking up rocks, some concrete for rip-rapping, but he found that he could not pick up these rocks. At the end of the day he was given his pay-off check because he couldn't do the work. He stated he did not find another job although he repeatedly tried to get one. His total earnings in 1952 were $467.16.

Glover stated at the trial that his arm ached and

said that when he tried to use it to pick up anything then he noticed it ached more. He is unable to do things that he had previously done before the shooting. He testified that he had had a high school education and that he had never done anything but ranching or physical work in his lifetime. When he was in the army he was a maintenance man. At the time of the trial he didn't know what he could do, being normally a right-handed man.

He stated that he incurred an indebtedness in the Sundance hospital of $15.00.

Glover's ranch land is in partnership between Glover and his brother, but there is no partnership in the stock which Glover owns. Glover stated that he is leasing at the present time the land from his brother that he owns by paying off the taxes and a land note. Glover said that that arrangement has existed since 1949. That was the situation which existed at the time he, Glover, was shot. Glover was then operating the entire unit by himself. There were about 1100 acres in the names of Glover and his brother jointly. However, his brother had nothing to do with Glover's ranch operation. Glover stated he runs between 27 or 28 Hereford cattle on his ranch. They are breeder stock most of them. He has one bull; the rest are cows.

Walker gets to use the land in connection with running Glover's cattle together with his own, Walker's, cattle on the ranch.

Glover testified he has known John Berger from the early years of his life. Berger and Glover had some trouble about keeping the former's horses off the Glover ranch.

Glover stated that on the afternoon of September 12, 1951, there was no ill will entertained by Glover toward

Berger and so far as he knew Berger bore him no ill will or animosity. That on the occasion that Henry Boles and Mrs. Fowler came to see Glover, arrangements were made for Glover to accompany Boles to the Berger place the following morning and that the purpose of that trip was to get a couple of bulls that had gone over into the Berger place and had attacked a bull belonging to Mae Baker, and Glover went along to estimate the damages that had been done to Mrs. Baker's bull. Glover stated he felt pretty sick after he had been shot.

He left home some time before 8 o'clock on the morning of the 13th of September. Boles' conversation at Mrs. Fowler's place was that Mrs. Baker had come over and said a couple of the Fowler bulls were over at the Berger place and for them to come and get them and also to have Glover help in estimating the damages inflicted on the Baker animal. That Glover had no part to play in connection with these bulls other than to assist Henry Boles in taking the Fowler bulls back home and to act as an appraiser on the damage that had been done to Mrs. Baker's bull.

Howard Cummins, called as a witness, testified he ran a motor grader patrol for the Wyodak Chemical Company. He stated he was in the vicinity of the Berger ranch on September 13, 1951, and saw Glover at that time. That when he first saw Boles and Glover he could see that they had their hands up in the air and were still on their horses. He ran the grader as close to the house as the road goes, or about 100 yards; then he got off the grader and saw that one of the men was off his horse. He found out later that that was Lee Glover. When Cummins got close to the house Lee Glover was kneeling on the ground holding his arm. Berger at that time was holding the rifle on Boles while

Boles was still on his horse with his hands up in the air. Boles didn't say anything during any of the time that Cummins was there, which was about 20 minutes.

After getting the two bulls out of the corral at Berger's place Mr. Darryl Baker gave Boles Mr. Glover's horse. He stated he did not hear Boles say anything at any time during this period. Boles left about seven or eight minutes after Cummins arrived at the Berger house. Cummins said he helped Mrs. Baker bind up Glover's arm and also tightened the tourniquet once or twice.

There was no medical testimony offered or admitted except on behalf of the plaintiff.

Dr. J. F. Clarenbaugh, the first doctor who saw Glover after the shooting had occurred, testified substantially as follows: He lives in Sundance, Wyoming; he has been 50 years in the practice as a physician and surgeon. (Defendant's counsel admitted Dr. Clarenbaugh's qualifications as a physician and surgeon without requiring testimony on the point.) The doctor stated he had known Lee Glover about 15 years; that he saw Lee Glover on September 13, 1951, at the Beagle Hospital in Sundance, Wyoming. Glover was brought in suffering from a gun shot wound of the arm and that the doctor made an examination of him at that time. That he found that the wound was a bad one in the right forearm; that he had a broken bone and the muscular tissues were all torn; and that Glover had been having quite a severe hemorrhage. Glover was very weak from loss of blood; he was given sedatives and the flow of blood from the wound was stopped. The wound was cleaned by the doctor as much as it was possible and then he ordered an ambulance and had Glover taken to the Veterans Hospital in Hot Springs, South Dakota. Dr. Clarenbaugh went with Glover in

the ambulance, owned by Clyde Roberts in Sundance. He left Glover at the Veterans Hospital in Hot Springs and didn't see him after that. Dr. Clarenbaugh testified that the reasonable value of his services on that day was about $50.00. There was no cross-examination of this witness.

Dr. Schuyler Brown the second medical witness called by the plaintiff testified that he resides in Lincoln, Nebraska. His business is that of a surgeon and he has been in that work since 1940. His qualifications were admitted by counsel for the defendant. Dr. Brown testified that on September 13, 1951, he was Chief Surgeon at the Veterans Administration Center at Hot Springs, South Dakota, and that that was the day he first saw Mr. Glover, who was in the surgical ward at the Veterans Hospital aforesaid. He made an examination of Lee Glover at that time. His examination was in connection with an examination being made by one of his associates Dr. Johnston. He found that Glover was in a condition of extreme shock with low blood pressure and a rapid pulse. That he was pale but that he was quite rational. Lee Glover had a gun shot wound of the right forearm. The dressings that were on at the time of his arrival at the hospital were quite saturated with blood. The wound of entrance was on the volar surface of the arm. The wound of exit was on the dorsal portion of the arm, i.e. the back of the forearm. The wound of entrance was approximately $5/8''$ in diameter and the wound of exit was about $2''$ in diameter. He stated that the one bone in the forearm, the ulna, was broken and there was, as the previous Doctor stated, very extensive injury to the muscles— they were in a rather shredded condition as would be found under those circumstances. The arm was greatly swollen, as is always the case where a bullet passes through an extremity, and that he would say probably

that in addition to the wound of entrance and exit there were tears on each side between the wounds of entrance and exit, which occurred due to the explosive action of the bullet as it passes through and breaks up inside. Dr. Brown stated that because of Mr. Glover's condition of extreme shock the proper medical procedure was to treat the shock and the man temporarily, first of all stemming any bleeding so that was done in the inspection of the wound. One or two small arteries, which were spurting, were clamped and tied and then the arm rebandaged and within about 20 minutes of the time he arrived at the hospital plasma was running and blood was being cross-matched so that by the time the plasma was in, the first bottle of blood was started and then another bottle of blood. He was given a total of a thousand centimeters of blood and 500 centimeters of plasma and after he had had that his condition was appreciably improved and he was taken to the operating room shortly after 6 o'clock where the wounds were debrided. By that the doctor meant removing from the wound all the particles of dirt, a few shreds of clothing and then fragments of muscle which were so torn away that they would not live and ordinarily would become gangrenuous; the idea being to thoroughly clean up the wound and remove all these shreds. Dr. Brown stated that there were also several particles of the bullet which were removed at that time and the arm was then bandaged and placed in a plaster of Paris Cast. That Cast was put on on the day of Glover's arrival, the 13th of September, and it was kept that way until October 22, 1951. All that time Glover was in the hospital. On October 22nd the plaster of Paris cast was removed; x-rays were taken when he came to the hospital and again after the cast was removed. At that time the skin was not completely healed nor was the comminuted fracture of the ulna healed, but there was partial healing at that time and the granulation

tissue, as it is called, was cleaned away; removed. Granulation tissue is simply the tissue that tends to grow about where you have an open wound and that was cleaned up and Glover was again placed in a cast. The second cast was kept in place for approximately one month to five weeks more. Again the cast was removed and x-rays were taken and it was found that there was quite a fair degree of healing of the ulna bone and the skin in the region of the bullet wounds was pretty well scarred down and Dr. Brown stated at this time they were able to start physiotherapy. He stated that the physiotherapist would assist Glover first of all in attempting the motion of the hand and of the fingers and then try and have Glover follow through with it. Glover also received whirlpool treatment, the arm being submerged in a bath of warm water which is agitated and gives the arm a massaging action which is of value to the muscles and it also assists one in attempting to move because of the buoyancy of the water. These whirlpool treatments were given to Glover daily.

Dr. Brown stated that the surgeons attending Glover were concerned especially with the nerve injuries which were very extensive in Glover's case — involving all three of the nerves in the forearm. On December 19th a neurosurgeon whom the Veterans Hospital brought in from Minneapolis, Minn., examined Glover. He found that there was a complete severance of the ulnar nerve in addition to the injuries to the radial and medial nerves. And he recommended an operation upon the ulnar nerve in the attempt to bring the two ends together in the hope that they would grow and that Glover would regain the innervation of that portion of his hand which was innervated by that nerve. By innervation is meant the stimulus which is given to a muscle by a nerve; that is, the stimulus going down the

nerve to the muscle and causing the muscle to contract.

Dr. Lyle French, the neurosurgeon, operated on Glover the following day and Dr. Brown was present at the operation which was performed on the 20th of December, 1951. At that procedure it was found that the ulnar nerve had been completely severed and a section of the nerve, two centimeters in length, (roughly ¾″ in length) had been destroyed. Dr. French then mobilized the nerve, that is, loosened it from the attachment to adjacent tissue to give it a little additional length; he also loosened it in the elbow region and then joined the two ends together by the fine type of sutures that neurosurgeons use for that purpose.

Glover was given leaves of absence for a couple of weeks, from time to time. Subjectively Lee Glover underwent much pain. All that is something that is, of course, experienced by the patient and all that a physician can do is to make some estimate of what must have been the case from the appearance of the patient and from what he knows such injuries cause other patients. Dr. Brown stated that Mr. Glover did undergo considerable pain. The acute pain which one has, the severe pain following a severe injury, tends to lessen as healing takes place. However, with nerve injuries there is very generally residual pain and abnormal sensations which continue indefinitely.

Glover, during his stay in hospital and from observation during his frequent examinations expressed great concern and worry about his family, children and ranch. Dr. Brown stated that everything was done that could be done to save Mr. Glover's arm. There was in the region of the wound of exit a very great scarring down of the muscles and of the skin which involved in this scarring down the radial nerve, another of the three nerves, and on February 10th, Glover was again operated on to remove that scar tissue, which by this time

had organized quite well, and the radial nerve which was caught in that mass of scarring was freed with the idea of improving the condition of that nerve. Glover was a very cooperative patient and did everything he was advised by the surgeons to do for the purpose of effecting a cure. Dr. Brown also stated that the night before the trial, i.e. October 27, 1952, he made an examination of Mr. Glover and again at the trial with Glover's arm bared he showed that the arm had an appreciable degree of atrophy or of wasting of the musculature. The forearm, two inches above the wrist, was three-quarters of an inch less in diameter than the left wrist. There was marked wasting away of the muscles of the hand and the circumference of the hand was 15/16ths of an inch less than the circumference of the left hand at that point. Several wounds were on the forearm. The surgeon then testified verbatim as follows: "The entrance wound was this one here (pointing) and that was also the incision for the purpose of operation on the ulnar nerve. This was an operative incision made here (pointing) to release the tension on the nerve and the wound of exit here and then this scar and two of them here were scars that resulted from the explosive action of the bullet. Now, insofar as the hand itself is concerned it is what we term medically a claw hand and we also speak of it as a claw hand in the thumb portion as a simian or ape hand because of some resemblance to the ape hand. Now, there is an inability to do certain things that the normal hand can do if we think of it from the standpoint of the way we examine and describe injured members one generally takes it up in terms of the gross movements of the hand. Well, in Glover's case, the gross movements of the hand are markedly impaired. For instance—well, I could go through a number of exercises here and ask him to do them but I might say that so far as making a

fist is concerned he can't do that, make a strong fist; that would be an example of a gross movement. He can't bring down his index finger now insofar as the fine movements are concerned, such as would be involved in the using of hand tools, a paint brush, I mean a smaller paint brush, making — well, the work one would do repairing about an automobile. His fine movements are almost completely gone. Now, the strength is markedly diminished; that is to say that now, for instance, taking a piece of paper between the thumb and forefinger you can hold it pretty tight. Now, he has no strength there to grasp a piece of paper between the thumb and forefinger. Now, another matter is because of the impaired radial action, if he is able to grasp something with a thumb and forefinger he is unable to let go because he cannot extend these fingers. However, if he bends his wrist in that way (demonstrating) then that puts these tendons on a stretch and that lets the thing be released. Now, insofar as sensation is concerned, he does sense touch here (pointing) but he can't—he just knows that something is touching him— he can't distinguish what it is. I have put different things in his hand, such as coins and whatnot, and asked, 'Now, what have you got there?' and he knows it is something but he doesn't know just what it is. From the standpoint of sensation to heat and cold he does have heat sensation to some degree in some parts of the hand, however, in the ulnar part it is completely gone. For instance, take a cigarette and light it and take the lighted end of it and put it up against his hand there and of course he doesn't know it is there."

The surgeon further testified that Glover has very little use of the hand and he would say that there is a disability of 60% to 90%, and he stated further that the injury sustained is of a permanent character. When Mr. Glover first came to the hospital the surgeon,

Dr. Brown, made an inquiry into his general health and found that it was normal and he might say excellent. The surgeon's recollection of Glover's age at that time was that he was 32 years old and that he has a normal expectancy of life, from the surgeon's knowledge of present day medical statistics, and could be expected to live to the vicinity of 75. Dr. Brown stated that he did not use the American Experience Table of the insurance companies because that is very old and people are living longer today. Dr. Brown also stated that he feels there may be some added fibrosis of the muscles of the forearm. By fibrosis he means that the injured muscles heal by the formation of scar tissue and as time goes on such scar tissue becomes somewhat firmer. There are still present in the forearm somewhat over 200 pieces of lead or particles of the bullet that are still there and they tend to form scar material around each of these particles and that sort of hardens the thing. Dr. Brown testified also that the arm will not get any better so far as use is concerned as Mr. Glover grows older.

Other facts will be mentioned as necessary in connection with the consideration of the legal questions involved.

The first claim of prejudicial error on the part of the trial court is that it should not have denied defendant's request for a continuance over the fall jury term in Campbell County. It is a general rule, well known to the legal profession, that the granting or refusing of a request for a continuance of a trial of a case is ordinarily a matter within the sound discretion of the trial court under the circumstances of each case. § 3-2002 W.C.S. 1945 is of aid here. It has already been quoted and will not be repeated at this point. It may be observed that although the defendant knew that plain-

tiff had been put to considerable expense in twice preparing his case for trial there was not even an offer on defendant's part to reimburse the plaintiff although the defendant's application for a change of venue was not resisted by the plaintiff, nor did the plaintiff request that he be given his costs incurred as a consequence of such change. Emphasis is stressed by defendant's counsel that the remainder of the jury panel which had not been engaged in the trial of the criminal case must have learned of the verdict rendered in that proceeding. As above described that part of the jury panel was, by the action of the trial court, excluded from the courtroom when the trial of the criminal case was concluded and the verdict rendered in it was not heard by the jurors so excluded. We may mention the fact that the record herein is devoid of showing that any attempt whatsoever was made to ascertain whether the jurors who sat in the civil case were in any way biased or prejudiced against the defendant. Indeed, it may be noted that the verdict rendered in the criminal proceeding was for a lighter grade of crime than that which the State had charged the defendant. It also does not appear that the defendant was obliged to use a single premptory challenge in order to obtain an impartial jury for the civil case.

It does not follow that because substantially the same facts were involved in the criminal cause as were required to be submitted in the civil cause that the jurors in the latter case could not deal fairly and impartially with the defendant in the last mentioned proceeding. It is to be noted that the parties were different and that different legal principles had to be applied in the criminal and civil cases. If the cause had been continued there could be no assurance that a jury panel could have been secured more impartial than the one that was sworn to serve in the civil case.

17 C.J.S. 253, § 78, after discussing the matter of prejudice on the part of the trial judge says:

" * * * nor is public excitement or prejudice ordinarily deemed a sufficient ground where the statute authorizes a party to ascertain the state of mind of a juror by preliminary examination. The decision in such cases, however, rests in the discretion of the court. A continuance is not warranted because a report of the recent trial of another cause depending on the same facts and principles has been published in a newspaper."

In Hurst v. Wickerly, 12 Fed. Cas. p. 1046, No. 6,940, the court held that:

"It is no ground for a continuance of a cause, that there has been published a report of the evidence, the arguments of counsel, and the charge of the court, in a case which has been tried; depending upon the same facts and principles. The publication of such a report of the proceedings of the court, is proper."

In Williams v. Altruda, 74 R. I. 47, 58 A. (2d) 562, 565, the court said:

"Furthermore, the defendant did not avail himself of the provisions of General Laws 1938, chapter 506, § 35, and move that each juror be examined on oath to ascertain whether, as a result of newspaper articles, the juror entertained any prejudice against the police in general and the defendant in particular. As a matter of fact, after a jury apparently satisfactory to the defendant was drawn, the trial justice, on his own motion and before the jury was sworn in, made inquiry to that effect.

"The burden of proof is on the party moving for a continuance. Ordinarily the granting or denial of such a motion is within the discretion of the trial court and its action will not be reversed unless there is a clear abuse of discretion. Anthony v. Anthony & Cowell Co., 40 R. I. 1, 99 A. 641; Wolfe v. Wolfe, R.I., 104 A. 689. The view expressed in these cases is in accord with the great weight of authority. See 86 A.L.R. 1249 annotation. An examination of the record before us does not

disclose by competent proof that there was prevailing in the community such prejudice against the defendant or the police generally as should have moved the trial court to grant a continuance on the ground that the case could not then be tried by a fair and impartial jury. On the evidence here the trial court did not abuse its discretion in denying defendant's motion for a continuance. This exception is overruled."

So in Courier-Journal Co. v. Sallee, 104 Ky. 335, 47 S.W. 226, the court remarked on page 227:

"The propriety of granting a continuance on this ground is necessarily relegated to the discretion of the trial judge, who, from closer contact with the people, is better able to judge of the intensity and universality of the prejudice complained. Ordinarily, public excitement or prejudice is not deemed sufficient ground for a continuance where the statute authorizes a party to ascertain the state of mind of a juror by examining him preliminary to challenge."

We cannot see that the trial court abused its discretion under the circumstances presented by this record in declining to grant defendant's applications for a continuance.

The complaint is made that Dr. Brown should not have been allowed to testify as to the ordinary life expectancy of the plaintiff. There is not the slightest question that Dr. Brown was qualified as an able and experienced physician and surgeon. Indeed, defendant's counsel admitted his qualifications as such; the fact that he was chief surgeon at the Administration Center of the Hot Springs, South Dakota, Veterans Hospital should be given some weight in considering this matter. The doctor pointed out that the American Experience Mortality Table is subject to some question because it is old and as the doctor stated, "people are living longer today." The doctors statement in this respect is shown, indeed, to be accurate in respect of

folks living longer now, by a comparison of the Mortality Tables given in 41 C.J. 216 and 58 C.J.S. 1211 and 1212. The last mentioned table is of date 1941 or at the time of trial of this case it was 11 years old. The witness was not cross-examined as to his knowledge of "present day medical statistics" to which he referred or what those statistics disclosed. But in this connection we call attention to the following utterances of the courts and text statements. In S. A. Gerrard Co. v. Couch, 43 Ariz. 57, 29 P (2d) 151, 155, the court said:

"The text in 17 Corpus Juris, 875, § 181, states the rule as follows: 'Where the permanency is controverted, the mortality tables may be admitted to be considered by the jury in case they find that the injury is permanent. Direct evidence as to plaintiff's expectancy of life, however, is not essential, but the jury may determine such fact from their own knowledge and from the proof of the age, health, and habits of the person and other facts before them.' Couch's age was not proved, but at the time he was employed as a pile driver, at a salary of $5. per day, and must have been in reasonably good health. By observation of his appearance the jury could estimate approximately his age and life expectancy."

In McCue v. Borough of Knoxville, the Supreme Court of Pennsylvania held that: (146 Pa. 580, 23 A. 439):

"2. In an action for personal injuries, a physician may testify as to what, according to his knowledge of mortality tables will be the duration of the life of a man of the age of plaintiff."

In Johnson v. Fiske, 125 Conn. 445, 6 A. (2d) 354, 355, the court pointed out that:

"A mortality table is not the exclusive evidence admissible to establish the expectancy of life, since age, health, habits and physical condition may afford evidence thereof."

25 C.J.S. § 81, p. 594, sums up the purport of the authorities thus:

"Mortality tables, however, are not the exclusive evidence admissible to establish life expectancy and the jury may determine such fact from their own knowledge and from the proof of the age, health and habits of the person and other facts before them."

We conclude that there is no merit in defendant's contention urged as above.

Complaint is made that the court erred in admitting certain other evidence; we have carefully examined all of the rulings charged and have reached the conclusion that if there was error committed it was not prejudicial. To consider them all in detail would unwarrantably extend this opinion and serve no useful purpose. In passing we mention, however, that it is insisted that the bill of Roberts for $65.50 on account of ambulance service was not shown to be reasonable. We think it is common knowledge that to furnish an ambulance and driver to carry an injured man and his physician as speedily as possible from Sundance to Hot Springs, South Dakota, a distance of considerably over 100 miles the bill rendered was not unreasonable.

It is urged that proof of special damages was allawed by the court when it was not pleaded. In plaintiff's petition we find it stated as already hereinabove set forth that: "Plaintiff is realiably informed, therefore states the fact to be, that it will be necessary for him to remain in said hospital for eight weeks; that for a year thereafter, he will be unable to pursue his usual and customary occupation; that during said year, he will have to undergo another operation in order that said forearm be further repaired and during all of which year, Plaintiff will not have the free use of his right arm and hand and he will be required to employ

help to do the work he ordinarily would do for himself, to his damage in the sum of FIVE THOUSAND ($5,000.00) DOLLARS." This allegation, it seems to us, made it reasonably clear what plaintiff was intending to prove over and above the damage that would necessarily follow from the infliction of the gun shot wound itself. As a foundation for the proof that was submitted and received, we think the allegations above set forth were certainly sufficient within the rule set forth in 17 C.J. § 307, p. 1004, that:

"As a general rule where the allegations of special damages are definite enough to apprise the adverse party fully of the probable evidence which will be introduced by plaintiff and to enable him to prepare his defense, they will be deemed sufficient."

It is suggested that the arrangement entered into between plaintiff and Walker was not a contract of hiring help as pleaded. It seems to us that because Glover had no money, his arrangement with Walker in effect amounted to an employment to meet the extremely difficult situation which he was obliged to solve the best he could. Defendant did not claim he was surprised and he undoubtedly had witnesses available who could have testified if it were a fact that Glover had sufficient funds to employ a man and did employ Walker to do the ranch work which Glover could not do as he formerly did prior to his injury. The ruling of the court in this matter was not such as to require a reversal of the judgment attacked herein.

It is said that the witness, Evans, was not qualified to testify as to the value of defendant's lands. He stated that they were worth about $12.50 per acre. It is contended that it is not proper to thus prove Berger's worth as a basis for exemplary damages. But Evans testified he was familiar with the Berger property. The jury could readily, from its own knowledge of land

values in that vicinity—a fact generally known—determine whether his testimony was reasonably accurate. Berger himself admitted that he had an income of from $1200 to $1500 a year from mineral claims on his land. There was no denial of the values placed on defendant's property. The jury, from the testimony introduced, could have had very little difficulty in determining the extent approximately of defendant's wealth.

In the case of Cosgriff Bros. v. Miller, 10 Wyo. 190 68 P, 206, the case where it was first held in this jurisdiction that it is proper to inquire into the pecuniary conditions and situations of the defendant in order to impose appropriate exemplary damages, the wealth of the defendants in that cause was proven by the testimony of one of the defendants who stated that he "guessed" their wealth "to be two or three hundred thousand" and that "it might perhaps be three hundred thousand dollars." We consider that the case at bar was one in which punitive damages could be and was properly awarded if the jury saw fit to do so. The evidence is that defendant shot at and inflicted a dangerous wound upon plaintiff; that the latter was unarmed, was not threatening or assaulting the defendant and that he had his hands raised above his head.

In Henderson v. Coleman, 19 Wyo. 183, 226, 115 P. 439, this court said:

"The evidence as to the value of defendant's sheep was doubtless introduced to show the financial condition of the defendant, as bearing upon the question of exemplary damages. It was held in Cosgriff v. Miller, 10 Wyo. 190, that where exemplary damages are claimed, it is proper to inquire into the financial condition of the defendant. It may be conceded that evidence of the value of a defendant's property, standing alone, will not establish his worth, for the property may be incumbered, and the party may be otherwise indebted. But it was clearly relevant upon the question. Evidence

may be relevant and admissible as such, though not sufficient in itself to establish the fact to which it relates. 'A relevant fact will not be rejected because not sufficient in itself to establish the whole or any definite portion of a party's contention.' (16 Cyc. 1116.) 'It need not of itself be sufficient to establish the issue, for the question of its relevancy is a different question from that of its sufficiency alone to support the verdict.' (1 Elliott on Ev. sec. 149.)"

The claim is advanced by the defendant that the court erred in excluding an offer of proof on behalf of the defendant, that the latter "did not use any more force than he thought was necessary at that time to prevent the assault he thought was going to be committed on him." Upon objection being made by the plaintiff "that it was objected to as calling for a conclusion of this witness, self-serving and invading the province of the jury," the objection was sustained and defendant excepted.

40 C.J.S. p. 1005, § 126 uses this language:

"In the majority of jurisdictions, the reasonableness of his belief is not determined from the standpoint of accused, that is to say, it is not to be measured by accused's standard of reasonableness, or by that of a man of the class to which accused belongs, such as a person of accused's age, temperament, intelligence, experience, or physical condition. * * *"

See authorities and cases cited, and in State v. Dickens 23 N. M. 26, 165 P. 850, the court quoting from a previous decision indicated the following as the prevailing rule in the United States:

" 'The standard by which the jury must determine the reasonableness of belief of accused that danger is so apparently imminent that he must act in self-defense is that of an ordinary person of firmness, reason, and prudence, not that such question should be determined from the standpoint of the accused.' "

In other words the problem is preeminently one for the jury to solve and this court has in effect so ruled in Loy v. State 26 Wyo. 381, 390, 185 P. 796 and State v. Sorrentino, 31 Wyo. 128, 138, 224 P. 420.

Complaint is also made that the court erred in refusing to give certain instructions. We have examined all of them carefully and upon comparing them with those which the court did give we are inclined to reach the conclusion that the defendant was fully protected in his rights in view of the evidence submitted in this case. To review each of these matters separately would unwarrantably and uselessly extend this case. 5 C.J.S. 1158, 1160, § 1774, states the rule to be:

"Appellant cannot complain of the refusal of instructions where no prejudice resulted from such refusal, as where the instruction is already covered by the charge given * * *"

(see cases cited by text.)

Instruction No. 24 which was refused by the Court reads:

"Although it is your duty to deliberate together with calmness for the purposes of arriving at a common conclusion, if that is possible, I charge you, however, that before you make up a verdict each of you must make up in your own mind, without reference to the other jurors, whether or not the defendant is guilty. In short, when men and women sit as jurors they sit as individuals, so far as their individual verdict is concerned, and the juror must be governed by his or her own conscience and not by the minds and consciences of his or her fellow jurors."

and error is assigned to the court's action is so ruling.

In City of Evanston v. Richards, 224 Ill. 444, 448, 79 N.E. 673, it appeared that one of the instructions given for the appealing party was modified by striking out this language:

" 'No juror should consent to a verdict which does not meet with the approval of his own judgment and conscience after due deliberation with his fellow-jurors, and after fairly considering all the evidence admitted by the court, and the law as given in the instructions of the court.' "

Expressing its disapproval of this phraseology, the Supreme Court of Illinois stated:

"Such instructions tend to encourage disagreements of juries and are not approved by this court. The trial court properly struck out that portion of the instruction. Chicago and Eastern Illinois Railroad Co. v. Rains, 203 Ill. 417."

We are inclined to think that the trial court properly refused this instruction. It contained altogether too much of a suggestion that would lead to a disagreement on the part of the jury. It intimated in effect that each juryman should disregard the views of his fellows no matter how reasonable or cogent these were. Seldom would a jury return a unanimous verdict if the views of a single juryman were to control the verdict as the instruction No. 24 aforesaid intimated should be done. See Gehrig & Chicago & Alton R. Co. 201 Ill. App. 287.

After a careful and painstaking examination of the record before us we do not feel that we should overturn the jury's verdict and substitute our judgment for that of the jury as to the amount of damages. We do not perceive in view of all the evidence any sound reason for holding the assessment of damages excessive so as to require a vacation of the verdict on that ground. Especially is this so in view of the depreciation of our currency as it at present prevails.

The defendant by his deliberate and uncalled for use of a deadly weapon subjected the plaintiff to an injury which could easily have proven fatal through loss of blood, and which in effect, obliged him to undergo sev-

eral serious and painful operations, producing a deformed right arm and a nearly useless hand, rendering him practically unfit for performing his customary and ordinary ranch work when he had a pregnant wife and young children looking to him for support. In view of all these facts it is not easy to see why the verdict of the jury should be regarded as excessive. Indeed, a more severe verdict would not have merited serious criticism. We are constrained to hold that no prejudicial or reversible error appears in the record and the judgment of the district court of Campbell County should be affirmed.

*Affirmed.*

BLUME, C. J., and HARNSBERGER, J., concur.