2015 WY 75

Jerome STOCKI, Appellant (Plaintiff),

v.

Billy K. NUNN and Dean Deveny,
Appellees (Defendants).

Jerome Stocki, Appellant (Plaintiff),

v.

Billy K. Nunn and Dean Deveny,
Appellees (Defendants).

Nos. S–14–0118, S–14–0149.

Supreme Court of Wyoming.

May 27, 2015.

Representing Appellant: David H. Day and Michael E. Day of Day Shell & Liljenquist, L.C., Murray, UT. Argument by Michael E. Day.

Representing Appellees: Kevin K. Kessner of Yonkee & Toner, LLP, Sheridan, WY for Dean Deveny; and Troy A. Ukasick and Shannon B. Sharrock, Loveland, CO for Billy K. Nunn. Argument by Mr. Kessner and Ms. Sharrock.

Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.

HILL, Justice.

[¶ 1] Plaintiff Jerome Stocki was a passenger in a vehicle involved in a two-vehicle collision and filed a complaint against both drivers alleging that their negligence caused him serious injury and damages. Shortly before trial, both drivers admitted liability and agreed to an equal apportionment of fault, but they continued to contest damages. Plaintiff asked for an award of damages in the range of $164,000 to $184,000, and a jury returned a verdict awarding him $80,000. Plaintiff appeals, claiming several errors in the district court's trial and post-trial rulings. We affirm.

### ISSUES

[¶ 2] Plaintiff presents eight issues on appeal, which he states as follows:

**Issue One:** Whether the district court abused its discretion when it excluded evidence of the accident.

**Issue Two:** Whether the district court abused its discretion when it allowed Defendants to present evidence of Plaintiff's tobacco and alcohol use.

**Issue Three:** Whether the district court erred in instructing the jury as to mitigation of damages.

**Issue Four:** Whether the district court abused its discretion in refusing to ask the jury regarding itemization of damages in the verdict form.

**Issue Five:** Whether the district court erred in instructing as to present value and excluding evidence on inflation.

**Issue Six:** Whether the district court erred when it refused to award prejudgment interest on Plaintiff's past medical expenses.

**Issue Seven:** Whether the district court improperly refused to sanction Defendants' counsel for violating mediation confidentiality.

**Issue Eight:** Whether the district court abused its discretion in refusing to reimburse Mr. Stocki for his share of the mediation fee.

## FACTS

[¶ 3] In 2008, Plaintiff and Defendant Dean Deveny both lived in Star Valley, Wyoming, and they both worked for Buffalo Valley Construction in Jackson, Wyoming. Although Mr. Deveny was Plaintiff's supervisor, they were also friends and frequently drove to work together. On the morning of October 24, 2008, Mr. Deveny and Plaintiff were traveling through the Snake River Canyon on their way to work in Jackson. Mr. Deveny was driving his truck, and Plaintiff was riding in the front passenger seat of the truck. Mr. Deveny's sister was also in the vehicle. Defendant Billy Nunn was driving the same road in his truck and was behind Mr. Deveny. Mr. Nunn's wife and children were also in his truck.

[¶ 4] It was still dark when Mr. Nunn's vehicle caught up to Mr. Deveny's vehicle in the canyon. In his deposition testimony, Plaintiff described what happened next:

> [A]s we're driving ... [Mr. Nunn] started flashing his lights, ... and Dean [Mr. Deveny] said something to the effect of ... "Well, are you gonna pass me?" And then as we're driving, Dean ... started slowing down, pulling off to the side. And then Billy [Mr. Nunn], ... basically was getting closer, flashing his lights more, and they were kind of doing the "back and forth," ... Like, I'm gonna pass; no, I'm not gonna pass; I'm gonna let you pass; I'm not gonna let you pass. And ... as they were driving, it ended up being Dean saying, "Okay, well, if you're not gonna pass—" then he decided to hit the brakes. And he said ... "Hang on." So then I grabbed onto the [handle on the dashboard]. And then [Mr. Nunn] pretty much just pile-drived us off to the shoulder.

[¶ 5] At the scene of the accident, no one involved in the accident complained of injuries. The parties worked together to pry the front bumper of Mr. Nunn's truck away from the truck's front tire and then left the accident site and proceeded on to Jackson. Mr. Deveny and Plaintiff reported to their work site and ran a few errands before going to the hospital.

[¶ 6] At the hospital, Plaintiff complained of pain in his right shoulder, back, and lower back and was given a shoulder immobilizer and prescribed a muscle relaxer and pain medication. Plaintiff was also instructed to follow up with Dr. Doug Weiss at Teton Orthopedics within a day or two, which he did. Dr. Weiss referred Plaintiff to physical therapy and also referred him to Dr. Geoffrey Skene, a non-surgical spine specialist at Teton Orthopedics for treatment of his right neck and intrascapular pain. Dr. Skene ordered an MRI and determined that Plaintiff did not suffer any disk herniation, fracture, or dislocation and diagnosed him with a soft tissue injury to the muscles and connective tissue in his neck and upper back. Dr. Skene continued Plaintiff's physical therapy and also ordered a trigger point injection to treat his back and neck pain. Between February 2010 and August 2010, Dr. Skene gave Plaintiff eight trigger point injections, and the last time Dr. Skene saw Plaintiff was in August 2010.

[¶ 7] During a physical therapy appointment ten days after the accident, Plaintiff reported that he was experiencing numbness and tingling in his right hand. Based on those complaints, Dr. Skene performed an EMG test to evaluate the conductivity of the nerves in Plaintiff's right arm, which resulted in a finding of mild carpal tunnel and an otherwise normal nerve study. Dr. Skene then referred Plaintiff to Dr. Heidi Jost, an orthopedic surgeon at Teton Orthopedics specializing in hand and upper extremity surgery, who then took over care of Plaintiff's complaints related to his right arm and hand.

[¶ 8] Dr. Jost saw Plaintiff on March 6, 2009, about four and a half months after the accident, and diagnosed him with injuries to the ulnar, median, and radial nerves in his right arm. Dr. Jost initially treated Plaintiff by having his arm placed in a splint to improve blood flow to his nerves and with a referral for physical therapy specifically directed to treating and healing the affected nerves. On June 1, 2010, Dr. Jost performed

surgery on Plaintiff's right arm, including: a right carpal tunnel release; an ulnar and radial nerve decompression; clean up of the nerves at the elbow; and excision of a ganglion cyst from the wrist.

[¶ 9] Dr. Jost last saw Plaintiff on May 1, 2013, at which time he was complaining of wrist spasms, dorsal forearm discomfort with weather, elbow pain with overuse, headaches from neck tension that were at times constant, sharp pains in his upper back, and a return of throbbing in his arm. He denied numbness and tingling. Tests of his grip strength showed that he had a fairly significant loss of grip strength in his right hand.

[¶ 10] On October 10, 2012, Plaintiff filed a complaint against both Mr. Deveny and Mr. Nunn (collectively Defendants) alleging that their negligence caused him damages, including past medical expenses, future medical expenses, lost past and future wages, lost earning capacity, damages for personal assistance and household help, and damages for pain and suffering, mental anguish, and loss of enjoyment of life. Plaintiff also sought punitive damages against Mr. Nunn for his alleged malicious, willful and wanton misconduct, but he subsequently dismissed that claim.

[¶ 11] On October 21, 2013, Defendants filed a notice of their admission of liability. Through that notice, Defendants admitted that they were equally at fault in causing the collision. They also informed the court that both Defendants had the same insurer and that the insurer had agreed to pay the entire judgment even if it exceeded Defendants' policy limits, thereby resolving the issue of fault apportionment.

[¶ 12] Concurrent with Defendants' notice of admission of liability, Mr. Deveny filed a motion in limine to exclude "questioning or presenting evidence at trial that is not relevant to the issues of causation and damages." Plaintiff objected to the motion in limine, arguing:

> In this case, Plaintiff seeks to admit facts regarding the force and severity of the accident, such as the speed the parties were going, how fast and hard Mr. Deveny hit his brakes, how closely Mr. Nunn was following Mr. Deveny when he hit his brakes, and how quickly Mr. Nunn reacted to Mr. Deveny hitting his brakes. The emotional state of the parties is relevant to this inquiry, as the more annoyed, frustrated, and aggressive Mr. Deveny was, the more likely it is that he slammed on the brakes and decelerated rapidly, which would have the result of increasing the force and severity of the accident. Plaintiff also seeks to admit the background facts of the accident to give the jury context and a coherent narrative. Telling the jury that Mr. Deveny slammed on his brakes and Mr. Nunn was following closely behind does not give the jury the full story—they should know why Mr. Deveny slammed on his brakes, his emotional state, and the reasons for his emotional state. This is relevant and probative under Rules 402 and 403 and should be admitted.

[¶ 13] In response to Plaintiff's objection, Mr. Deveny clarified that he did not object to questions or evidence regarding the speed Defendants were driving when the collision occurred or the force of the impact. The district court heard argument on Mr. Deveny's motion in limine before the parties gave their opening statements. At that point, the court made some preliminary observations and limitations on the parties' opening statements, but otherwise reserved ruling on the motion. We will discuss the district court's further rulings on evidence related to the accident when we address Plaintiff's claim of error related to those rulings.

[¶ 14] The jury trial on Plaintiff's claims was held from November 4, 2013 through November 7, 2013. Plaintiff asked the jury to award damages in the range of $164,000 to $184,000 for past and future medical expenses, past and future lost wages, pain and suffering, and loss of enjoyment of life. Defendants conceded responsibility for medical expenses related to Plaintiff's back, neck, and shoulder injuries, but they disputed that the accident caused the nerve damage in Plaintiff's right arm. Defendants also contested the amounts claimed for lost earning capacity, pain and suffering, and loss of enjoyment of life. The jury returned a verdict awarding Plaintiff $80,000.

[¶ 15] On December 5, 2013, Plaintiff filed a proposed form of judgment, which included an award of prejudgment interest in the amount of $9,198.18. Defendants objected to an award of prejudgment interest, and on January 21, 2014, the district court entered its Judgment on Civil Jury Trial, which reduced the jury verdict to a judgment without an award of prejudgment interest.

[¶ 16] On January 24, 2014, Plaintiff filed a verified certificate of costs in which he requested among other costs, an award of $408.33 for his share of the cost of court-ordered mediation. Defendants objected to Plaintiff's request for an award related to the mediation costs, and in so objecting, disclosed settlement discussions that took place during that mediation. Plaintiff responded with a motion for sanctions for Defendants' breach of mediation confidentiality.

[¶ 17] On April 21, 2014, the district court issued an Order on Post–Trial Motions. Among other rulings, the court denied Plaintiff's request for an award related to his share of the mediation costs. With respect to Plaintiff's request for sanctions, the court agreed that Defendants violated the mediation confidentiality requirements, but it concluded the circumstances did not warrant an award of sanctions. In response to a request from Plaintiff, the court also provided a written explanation for its denial of prejudgment interest.

[¶ 18] Plaintiff filed separate notices of appeal from the district court's Judgment upon Civil Trial and its Order on Post–Trial Motions. The two appeals were thereafter consolidated.

### STANDARD OF REVIEW

[¶ 19] Plaintiff's appeal of the district court's trial rulings includes challenges to the court's rulings on the admissibility of evidence and instructions to the jury, and to the court's ruling on how damages would be categorized on the verdict form. These are all rulings this Court reviews for an abuse of discretion.

[¶ 20] With respect to rulings on the admissibility of evidence for an abuse of discretion, we have said:

Generally, decisions regarding the admissibility of evidence are entrusted to the sound discretion of the district court. We afford considerable deference to the district court's decision and, as long as a legitimate basis exists for the district court's ruling, it will not be reversed on appeal. Under the abuse of discretion standard, our primary consideration is the reasonableness of the district court's decision. The burden of establishing an abuse of discretion rests with the appellant.

If we find that the district court erred in admitting the evidence, we must then determine whether or not the error affected [the appellant's] substantial rights, providing grounds for reversal, or whether the error was harmless. The error is harmful if there is a reasonable possibility that the verdict might have been more favorable to [the appellant] if the error had never occurred. To demonstrate harmful error, [the appellant] must prove prejudice under circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play

*Singer v. Lajaunie,* 2014 WY 159, ¶ 31, 339 P.3d 277, 286 (Wyo.2014) (quoting *Proffit v. State,* 2008 WY 103, ¶ 12, 191 P.3d 974, 977–978 (Wyo.2008)).

[¶ 21] With respect to challenges to jury instructions, we have said:

When we review claims of error involving jury instructions, the district court is afforded significant deference. *Luedtke v. State,* 2005 WY 98, ¶ 28, 117 P.3d 1227, 1232 (Wyo.2005). A district court is "given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found." *Id.* (citations omitted); *see also Hawes v. State,* 2014 WY 127, ¶ 15, 335 P.3d 1073, 1078 (Wyo.2014). Its ruling on an instruction must be prejudicial to constitute reversible error. *Heywood v. State,* 2007 WY 149, ¶ 26, 170 P.3d 1227, 1234 (Wyo.2007) (citation omitted), abrogated on other grounds by *Granzer v. State,* 2008 WY 118, 193 P.3d 266 (Wyo.2008). Because the purpose of jury instructions is to provide guidance on the applicable law,

prejudice will result when the instructions confuse or mislead the jury. *Id.*

*Brown v. State,* 2015 WY 4, ¶ 40, 340 P.3d 1020, 1031 (Wyo.2015); see also *Adekale v. State,* 2015 WY 30, ¶ 37, 344 P.3d 761, 770 (Wyo.2015) (citing *Budder v. State,* 2010 WY 123, ¶ 7, 238 P.3d 575, 577 (Wyo.2010)) (challenges to jury instructions are reviewed for an abuse of discretion and district court is given substantial latitude to tailor jury instructions to the facts of the case).

[¶ 22] Our review of a district court's ruling on the form of the verdict tracks our review of jury instructions:

"The submission of . . . a particular form of special verdict is vested in the sound discretion of the trial court." *Turcq v. Shanahan,* 950 P.2d 47, 53 (Wyo.1997). We consider the verdict form together with the instructions provided to the jury. *Pauley v. Newman,* 2004 WY 76, ¶ 12, 92 P.3d 819, 824 (Wyo.2004). Reversal may only be predicated upon an abuse of the court's discretion. *Addakai v. Witt,* 2001 WY 85, ¶ 16, 31 P.3d 70, 73 (Wyo.2001).

*HJO v. State (In re KMO),* 2012 WY 99, ¶ 28, 280 P.3d 1203, 1213 (Wyo.2012).

[¶ 23] Plaintiff's remaining challenges are to the district court's post-trial rulings, and we will discuss the standard of review applicable to the post-trial rulings in our discussion of those issues.

### DISCUSSION

**A. Exclusion of Evidence Related to the Accident**

[¶ 24] Plaintiff argues on appeal, as he did in opposition to Defendant Deveny's motion in limine, that evidence relating to how the accident occurred was critical to his proof of damages. Plaintiff contends:

In this case, Plaintiff sought to admit facts regarding the force and severity of the accident, such as the speed the parties were going, how fast and hard Mr. Deveny hit his brakes, how closely Mr. Nunn was following Mr. Deveny when he hit his brakes, and how quickly Mr. Nunn reacted to Mr. Deveny hitting his brakes.

The emotional state of the parties is relevant to this inquiry, as the more annoyed, frustrated, and aggressive Mr. Deveny was, the more likely it is that he slammed on the brakes and decelerated rapidly, which would have the result of increasing the force and severity of the accident. Plaintiff also sought to admit the background facts of the accident to give the jury context and a coherent narrative. Telling the jury that Mr. Deveny slammed on his brakes and Mr. Nunn was following closely behind does not give the jury the full story—they should know why Mr. Deveny slammed on his brakes, his emotional state, and the reasons for his emotional state. This is relevant and probative under Rules 402 and 403 and should be admitted.

[¶ 25] Based on our review of the record, we reject Plaintiff's argument. At the outset of the trial, the district court provided only a preliminary ruling on the admissibility of evidence concerning the accident, noting that it could not provide a firm ruling until it heard the evidence. As the trial proceeded and the court learned more precisely what the evidence would be and its relevance, the court's ruling became more definite. This is important because this Court has held that where a trial court issues a preliminary ruling excluding evidence, subject to further consideration during trial, the proper procedure is for the party seeking admission of the evidence to make an offer of proof. *Silva v. State,* 2012 WY 37, ¶ 20, 271 P.3d 443, 450 (Wyo.2012). Failure to make that offer of proof strips the district court of its "ability to reconsider its exclusion of evidence at an appropriate time during trial," and results in a waiver of any claimed error. *Id.,* ¶ 21, 271 P.3d at 450. Unless a court's ruling on a motion in limine is definitive, a party waives objection to the exclusion of evidence, or the admission of evidence in some cases, if that party does not renew his objection at the appropriate time during trial. *Hicks v. Zondag,* 2014 WY 16, ¶ 14, 317 P.3d 606, 610 (Wyo.2014).

[¶ 26] As we will discuss in more detail below, Plaintiff did not follow this procedure with respect to evidence he sought to intro-

duce concerning the speed of the vehicles and how hard Mr. Deveny braked. Even had Plaintiff followed those procedures, however, we find that his argument as to the relevance of the excluded evidence and the prejudicial impact of its exclusion is simply not supported by the record. The record contains no evidence that the speed of the vehicles or the nature of the braking was a factor in the medical testimony regarding causation of Plaintiff's injuries. Moreover, although much testimony was permitted regarding the force of the collision, the force of the collision was likewise not a factor of particular significance discussed in the medical testimony on causation.

[¶ 27] Because our review of the errors alleged by Plaintiff must be done in the context of the district court's evolving rulings, we divide our discussion below into a review of the errors alleged before the district court made a definitive ruling on the admissibility of the evidence and those alleged after the court made its definitive ruling.

### 1. *Errors Alleged before Definitive Ruling on the Motion in Limine*

[¶ 28] The district court first addressed the motion in limine after jury selection and before opening statements. In this preliminary discussion, the court informed the parties that it was addressing the issue pursuant to W.R.E. 403 and that what it would be evaluating was the relevance of the evidence as it pertained to Plaintiff's damages because that was the only issue before the jury. The court observed that any other relevance the evidence might have was likely to be outweighed by its potential for unfair prejudice. The court then placed some limitations on discussion of the accident's particulars during opening statements but otherwise reserved ruling on the motion:

> THE COURT: ... I think it's fine to say, you know, that it was a rear-end collision and if you have evidence of speed and circumstantial evidence [of] the impact by virtue of the photographs and so on that you can go into that....
>
> . . . .

> I don't want you to mention it in opening beyond saying there was a rear-end collision and if you guys want to further talk about it, I mean maybe it's just me, but I mean I could put myself as a juror and say, well, gosh, how exactly did this happen, but on the other hand I don't know how much of that really is truly relevant and I don't think if it gets into the road rage thing then you're inviting this prejudicial decision by the jury.
>
> So if you guys are inclined to try to, you know, write up some stipulation before we really enter the—much of the evidence about the circumstances of it to show that there was braking and the car behind ran into the car in front and this was a rear-end collision and then this is the result, you know, that would be worth considering. And I'll think about it some more, but I don't want you to go into it during the opening.
>
> [Plaintiff's Counsel]: Can I talk about the damage to the vehicle? That's relevant, right?
>
> THE COURT: Yeah, sure.
>
> [Plaintiff's Counsel]: Okay.
>
> THE COURT: And some of these are mushy, you know, it's hard for me to make a totally fine line there for you on these motions in limine when I haven't heard the evidence.

[¶ 29] Before opening statements, the district court then read the jury a number of preliminary instructions, including Instruction No. 10 which instructed:

> It is admitted by Billy K. Nunn and Dean [Deveny], the Defendants, that they were responsible for causing the accident at issue. Because of this admission, the questions remaining for your determination are: (1) whether the accident caused injury and damage to Plaintiff; (2) what elements of damages, if any, were suffered by the Plaintiff as a result of the accident; and (3) the amount of damages, if any.
>
> The Defendants' admission with respect to causing the accident should neither prejudice nor influence you in determining the issues of causation of damages.

[¶ 30] In Plaintiff's case in chief, the first witness to the accident itself that Plaintiff called was Defendant Nunn, the driver of the rear vehicle. Concerning the force of the collision, Plaintiff asked Mr. Nunn about damage to the vehicles as well as the following additional questions:

Q. Okay. And when you rear-ended Mr. Deveny's truck you hit him, you hit the back of his truck where the trailer hitch is, right?

A. Yes.

Q. And just before you hit him your wife screamed, didn't she?

A. I believe so.

Q. Okay. Mr. Nunn, just want to ask you a couple more questions. You wouldn't dispute, would you, that the accident you were in was a serious accident, would you?

A. It was substantial.

Q. Okay. And in fact on a scale of one to ten, with one being sort of a very minor accident and ten being the worst accident you've ever seen, you would have rated this accident as a six or seven, right?

A. Correct.

[¶ 31] On direct examination, Plaintiff did not ask Mr. Nunn how fast he was driving or what precipitated the accident. On cross-examination, Mr. Nunn testified that he did not suffer injuries in the accident and nor did his wife or three children who were also in the truck with him. He further testified that he was able to have his truck repaired and continues to drive the truck. Plaintiff asked no questions on redirect, leaving unasked the question of what speed Mr. Nunn was driving.

[¶ 32] Plaintiff next called Defendant Deveny, the driver of the vehicle in which Plaintiff was riding. On direct examination, Plaintiff asked about damage to Mr. Deveny's truck, including how the force of the collision bent the trailer hitch on the truck and lifted and ripped a 300–400 pound toolbox from the location where it had been bolted to the bed of the truck. Plaintiff did not ask Mr. Deveny how fast he was driving or how hard he braked before the collision on either direct or redirect examination.

[¶ 33] At one point during Mr. Deveny's testimony, the district court advised counsel that he had overlooked giving jurors the opportunity to present questions following Mr. Nunn's testimony and that the court would have Mr. Nunn retake the stand for those questions following completion of Mr. Deveny's testimony. It was in the juror questions, first for Mr. Deveny, and then for Mr. Nunn, that questions of what speed the vehicles were traveling at the time of the accident was first presented. Plaintiff approved having the juror questions asked, but Defendants objected to the questions. The court determined, because of concerns that the questions would lead into accident details that the court was trying to avoid, that the questions would not be asked.

[¶ 34] At the point in the trial when Plaintiff called Defendants to testify, the district court had not definitively ruled on the motion in limine regarding evidence of the accident. The only ruling the court had made was the preliminary ruling the court gave before opening statements, which was essentially a ruling that the court would consider the evidence as the issue arose during trial. The issue of whether Defendants could be asked the speed they were driving or how hard Mr. Deveny braked did not arise during Plaintiff's examination of either Defendant, however, because Plaintiff did not ask the questions. Because Plaintiff did not ask the questions and did not make an offer of proof, he waived any error in the exclusion of Defendants' testimony on the questions of speed and braking.[1]

---

1. Plaintiff did not identify the district court's ruling on the juror questions as an issue on appeal, and we therefore do not address that ruling. We do note that we do not view the juror questions regarding the vehicle speed as prejudicial or as inevitably leading to the type of road rage evidence the district court was trying to avoid and are therefore perplexed by the court's decision not to allow the questions. As we discuss in the following section of this opinion, however, the medical testimony Plaintiff presented concerning the cause and magnitude of Plaintiff's injuries was not linked to the speed of the vehicles or the force of the impact. The evidence was therefore of marginal relevance to the ques-

## 2. *Errors Alleged after Definitive Ruling*

[¶ 35] At the close of the second day of trial, shortly after the above-described testimony and rulings, the following discussion took place outside the presence of the jury:

[Plaintiff's Counsel]: ... Your Honor, I know your concern about keeping out the accident facts in this case, but it's causing a lot of problems in how the jury is perceiving the case. If we look at the questions they've asked, their concern that the photographs don't show as much damage as they would expect. They are wondering if he was holding onto the handle, that was another question that I think didn't ask—actually, I don't recall, don't quote me on that.

THE COURT: That certainly wouldn't have been precluded.

. . . .

[Counsel for Nunn]: I believe a juror asked [Plaintiff's physical therapist] whether anybody asked [Plaintiff] about a handle.

[Plaintiff's Counsel]: I stand ·corrected.

THE COURT: That's correct.

[Plaintiff's Counsel]: If he's holding onto the handle and now the jury is also asking about the speeds of the accident. And so you can see what's the on (sic) is they're trying to sort this out, they're trying to put this puzzle together of what happened in this accident.

And because we have been so restricted in describing the facts surrounding the accident they are left with a very sterile picture of what happened and it is not fair to my client. And I know the Court's concern that we don't want to have some runaway verdict and something—some road rage kind of presentation.

The first thing I would say is that I've told the Court that I wouldn't try to go overboard in making this about punishing them or inflaming the jury for their conduct.

Secondly, that was their conduct. I mean the evidence is that they were brighting, that they were stopping, coming. And so they have been able to engage in

that conduct and they've been successful in not letting the jury know about it so that the jury is left wondering what even happened, why it happened.

And so this is really coming to a point as the trial has developed. One of the things I'm going to ask Jerome [Plaintiff] is if he held onto that handle and if he knew or sensed that there was going to be an impact, okay? If all I can say is that he was just holding onto the handle, that doesn't make sense to them. Why does someone sit there and do this as [they] are going down the road? [It's] not the truth, it's not what happened.

But it's key to his damages because— and it's reflected in the question that was asked by the juror about whether he's holding onto the handle because if he's holding onto the handle he's going to sustain an injury to that arm or it's going to be more likely that he's going to do that.

And so if I can't—if I can't tell them that—that based on the events that had gone on that he knew or sensed very strongly that he was—there was going to be an impact and he grabbed on and he didn't just grab on, but he braced for impact so he tensed his muscles, okay? I think that was the question, was whether he braced for impact.

'If I can't allow the facts to come in around that that explains why he did that then—then the jury is left with this sterile case that doesn't make sense to them. And so I would implore the Judge—I would implore you, Judge, to let me have some leeway. I promise I will not start yelling at them or inciting them, inciting the jury.

I just want to be able to bring out why he would have grabbed onto that, that he sensed an impact that he needed to protect himself from. And I know we've argued about this and I can't say it any better.

THE COURT: Well—

[Plaintiff's Counsel]: I'm strapped.

THE COURT: Let me—

[Plaintiff's Counsel]: It's not fair.

tion of damages, which was the only question presented to the jury.

THE COURT:—say that I need to have a better solution than that. I don't think that the defendants objected and it wasn't necessarily the intent of my ruling to preclude all the circumstances of the accident as it relates to the nature of the impact, if there was reasonable evidence of speed, things like that and I think that's a reasonable thing to do.

What I keep hearing you say is—then maybe I'm not—I mean I need a better solution because I keep hearing that you want to be telling the jury the kind of facts that are going to just naturally lead to the conclusion that this was a road rage incident and that's what we want to avoid.

For instance, you know, he slammed on the brakes because somebody was behind him that was so close and they had their lights on and it was blinding him. I mean if there were a way to present some of these circumstances that go to the relevance of the injuries and serve to explain this a little bit more to the jury so that they don't have those questions, that's fine.

Now, whether that's—since, you know, the defendants have basically said they don't necessarily object to some of these circumstances of the accident, you guys know what the deposition testimony was, you guys know what would be elicited here, I don't. It would seem to me that there could be a stipulation that would put this in noninflammatory terms and advise the jury a little bit more about—a little bit more about the circumstances of the accident.

You know what each one of these gentlemen would testify about speeds, about hard braking, about being unable to stop and a rear-end collision, I don't. And in order for me to find out as we go through that testimony live in court we risk this prejudice that I'm trying to avoid. So I'm not unsympathetic to you and I think it's not unreasonable to want to get into some of that, I'm looking for a better solution.

[Plaintiff's Counsel]: Let me—what if— what if—this is a proposal, I'm thinking outside the box, but what if we had a statement from you that said we know you've been asking questions about some of the facts surrounding the accident and all you need to know is that due to the actions of both defendants there was— there was an anticipation of an impending accident and . . .

THE COURT: We're not going to carve this out right now, this is the kind of thing that I'm suggesting that maybe you can agree upon and maybe we can avoid this concern.

. . . .

So, you know, I would like you guys to make an effort to do something. Now, if you simply can't agree on something then I'll let you each make your proposal to me and/or objection and I'll reconsider my ruling, but I'll give you the evening to do that.

[¶ 36] The next morning, the district court made a more definitive ruling on the motion in limine based on an instruction, stipulated to by the parties, which the court accepted and numbered as Instruction No. 12. The instruction read:

With respect to questions that have arisen from the jury, you are advised as follows: both Mr. [Deveny] and Mr. Nunn committed actions that directly caused the accident, and for this they have admitted that they are fully responsible for the accident.

In regard to the circumstances surrounding the accident, you are to accept the following as true: that Mr. [Deveny] applied his brakes before he was rear ended by Mr. Nunn and that Mr. Stocki had warning of an impending collision.

[¶ 37] In accepting this instruction, the district court commented on the discussions with counsel in chambers concerning the instruction:

. . . There was continued discussion about what further circumstances of the accident were relevant here in light of the liability admitted by the defendants and the defendants noted that, number one, they are not really contesting that the injuries to the neck and back were caused by the accident and, number two, that the reason they are contesting the injuries to the hand and arm is because of the latent disclosure of that after, like I think they identify ten

days or something after the accident. They're not contesting that that didn't occur because of a lower impact collision or a low speed collision, they are merely contesting that because of the latent disclosure of it.

That makes circumstances of speed and the further circumstances of the accident I would say marginally relevant at best and to the extent that it's relevant because of what we've talked about with regard to road rage and those kinds of things not— or trying to avoid that from the jury's consideration because it would be prejudicial and inflammatory. The Court would find under 403 that further inquiry along those lines would—there would be substantial prejudice outweighing any probative value so I don't want us to go into that.

There are already photographs that have been admitted and there's been a fair amount of testimony about the impact itself, how it bent the bumper and tore back the toolbox and the parties have said that this was a significant impact I believe the testimony so far has been.

So we're going to leave that alone and appreciate the parties working together to develop an appropriate instruction for the Court to read to the jury to further put these circumstances—clarify the circumstances that are relevant.

So is there anything that anyone needs to put on the record with regards to my ruling?

. . . .

[Plaintiff's Counsel]: Your Honor, the only thing I think I would add is that by coming to an agreement with this instruction I'm not waiving any objection I have to what's gone on and how evidence of the accident has been excluded and I just want to make that clear.

THE COURT: Sure.

[¶ 38] The district court then read Instruction No. 12 to the jury; and Plaintiff returned to the stand to continue his testimony that had begun late the prior afternoon. On direct examination, Plaintiff testified without objection:

Q. Okay. We just heard the Court read an additional instruction to the jury and let me followup a little bit on that. So in the accident just before the impact were you expecting that there would be an accident?

A. Yes.

Q. And what did you do because you were expecting that?

A. I put my hand onto the—there's a bar that goes above the dash on the GMC, I put my hand directly on that and kind of, you know, pushed back to brace for the impact.

. . . .

Q. Okay. And just before the impact did Mr. Deveny say anything to you?

A. He did.

Q. What did he say?

A. He told me to hang on.

Q. Okay. And then in relation to when Mr. Deveny said that and when you grabbed onto the handle when did the impact occur?

A. It was within seconds I would think.

Q. Okay. Was there stuff on the dashboard?

A. There was.

Q. Did it fly off?

A. It did.

Q. How would you describe the feeling of the impact?

A. It was like getting hit with a ton of bricks. I mean by holding on it jarred me back and forth and, you know, forced me into the—into the dash. It was very forceful.

Q. Did it force you back and forth?

A. Yes, back and forth.

Q. Okay. And as it was forcing you back and forth were you holding onto that handle?

A. Yes.

■ [¶ 39] With the foregoing backdrop of the district court's ruling on the admissibility of evidence related to the accident and the evidence that was admitted concerning the force of the collision, both before and after the court's definitive ruling, we turn to Plaintiff's contention that the district court's

ruling abused its discretion by excluding relevant evidence, which unfairly prejudiced him.

[¶ 40] The admissibility of evidence is governed by W.R.E. 401, 402, and 403. *Parker v. Artery*, 889 P.2d 520, 523 (Wyo.1995). W.R.E. 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. W.R.E. 402 further provides that all relevant evidence is admissible and that irrelevant evidence is inadmissible. However, while some evidence may be relevant, that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. W.R.E. 403.

[¶ 41] In *Parker*, this Court upheld a ruling excluding evidence that a driver was intoxicated at the time of the collision after the defendant admitted liability and the trial court dismissed a punitive damages claim. We explained:

> The district court correctly ruled that evidence of Pounder's intoxication at the time of the collision was inadmissible. W.R.E. 402. The questions before the jury concerned the extent of the damages suffered by the Parkers. The cause of those damages, Pounder's failure to stop at an intersection while impaired, was no longer at issue. The personal representative had stipulated to Pounder's legal responsibility for the injuries to the Parkers. The jury was informed that Pounder had failed to stop at the stop sign and caused a collision. The only relevant evidence, therefore, was evidence which would have had a tendency to make more probable the proof of the extent of the compensatory damages suffered by the Parkers. W.R.E. 401
>
> . . . .
>
> The Parkers argue that black letter law recognizes a party is not required to accept the judicial admission of an adversary; but, instead, may insist on proving the fact.

*See, e.g., Barnes v. State*, 858 P.2d 522, 528 (Wyo.1993) and *Parr v. United States*, 255 F.2d 86, 88 (5th Cir.), *cert. denied*, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958). This rule of law, however, is subject to the balancing test of W.R.E. 403. *See, e.g., Barnes*, 858 P.2d at 529 and *United States v. Provenzano*, 620 F.2d 985, 1004 (3rd Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

> The probative value of the evidence of Pounder's intoxication to the damages issues before the jury was substantially outweighed by the danger of unfair prejudice. W.R.E. 403. The jury was being asked a series of narrow questions regarding the extent of the compensatory damages suffered by the Parkers. Compensatory damages are limited to the general and special damages which compensate for the total harm proximately caused by the breach of a duty owed to the injured party. *Martinez v. City of Cheyenne*, 791 P.2d 949, 959 (Wyo.1990); Black's Law Dictionary 390 (6th ed. 1990). The introduction of evidence of intoxication would have unfairly prejudiced the jury to enhance the compensatory damages as a means of punishing Pounder. Despite society's revulsion at drunken driving, our system of justice reserves such civil punishment to awards of punitive damages. *Squaw Mountain Cattle Co. v. Bowen*, 804 P.2d 1292, 1298 (Wyo.1991).

*Parker*, 889 P.2d at 524.

[¶ 42] In this case, the district court was similarly concerned that evidence of the events surrounding the accident would invite the jury to enhance compensatory damages because of the reckless and road rage type behavior of both Defendants. Plaintiff disputes this concern and argues on appeal that the prejudice to Defendants was outweighed by the relevance of the evidence. In particular, Plaintiff argues the emotional context of the accident, which caused Defendant Deveny to slam on his brakes, was critical to proving why Plaintiff braced for the accident and gripped the handle above the glove box, as well as the resulting forces that came to bear on Plaintiff and caused the nerve damage in his right arm. We disagree and find

no support for this argument in the medical testimony.

[¶ 43] Defendants presented expert evidence on the cause of Plaintiff's arm injuries through the testimony of Dr. Jennifer Kummer, an orthopedic surgeon specializing in hand and upper extremity surgery. Dr. Kummer opined that the nerve damage in Plaintiff's right arm was unrelated to the accident. Dr. Kummer did not base her opinion on the position of Plaintiff's arm during the accident or anything related to the force of the collision, such as the speed of the vehicles at the time of the accident or the suddenness of the braking. Instead, her opinion was based on the timing of Plaintiff's symptoms:

In my opinion if you have an injury that results in the claimed symptoms and diagnoses you typically have symptoms very early in the elbow, whether it be pain, swelling, numbness, tingling, a number of different things, but I didn't see any evidence of those initially on my evaluation in reviewing the records.

[¶ 44] Dr. Kummer noted that Dr. Weiss had specifically examined Plaintiff's right elbow and wrist four days after the accident and found no gross deformity and no tenderness, and that Plaintiff had full range of motion in both areas. Dr. Kummer accepted the suggestion that there could be nerve damage and irritation that does not immediately become fully symptomatic, but it was her opinion that if that damage were caused by the accident, there would immediately be swelling or bruising of the affected area.

Right. That's the reason and that's the explanation for why these things can present down the road and I think that makes complete sense. If you have an injury you get swelling, you get scarring, the nerve gets irritated and it gets irritated down the road.

However, in looking back at Mr. Stocki's records in reviewing the emergency room records, the records four days later when he was in Dr. Weiss's office, he didn't have any of those things. He didn't have the swelling, he didn't have the bruising.

And if in my opinion if you have an injury to the elbow or wrist that's going to

cause these things that's something that you would present with initially, it doesn't happen, the swelling doesn't happen weeks, months down the road in my opinion.

[¶ 45] In contrast to Dr. Kummer's opinion, Plaintiff's treating surgeon, Dr. Heidi Jost, testified that based on Plaintiff's presentation and history, it was her opinion that the nerve damage in Plaintiff's right arm was caused by the accident. Dr. Jost disagreed that there had to be immediate swelling or bruising in order to attribute delayed symptoms to a trauma. She explained:

A. Well, there are many people who have an accident where there's a traction injury or force that affects your nerve, there's bleeding around the nerve, then that turns into scar tissue and that then becomes constrictive around the nerve which limits the blood flow which causes the nerve to go to sleep.

So that's the sequential physiologic response of a nerve to injury and it doesn't have to, unless it's absolutely severe at the time of injury, occur immediately. It can occur over time and I believe it can even occur years later.

. . . .

Q. ... Can someone have a traumatically caused injury without having bruising and swelling in their arm?

A. Yes.

Q. And could you explain that? Why— why wouldn't you necessarily see bruising and swelling?

A. Well, nerves are a funny thing, on a microscopic level you can't always see it. Sometimes even when I am in surgery and I'm looking at the nerve knowing that it's damaged, it doesn't look damaged. So you maybe don't expect to see something externally even as close up as looking at the nerve.

[¶ 46] On cross-examination, Dr. Jost further testified:

Q. The primary reason that you relate Mr. Stocki's right upper extremity symptoms to the accident versus other causes is because that's what he's telling you, he

didn't have them before the accident and he has them now?

A. That's correct.

[¶ 47] Dr. Jost clearly disagreed with Dr. Kummer's opinion on causation, but as with Dr. Kummer, Dr. Jost did not base her opinion on factors relating to the force of the collision. Indeed, on redirect examination, Dr. Jost clarified that the position of Plaintiff's hand and arm was not that significant to her opinion:

Q. So let's review the facts a little, he's in an accident, he's holding onto a bar, he has some going back and forth where he [has] some traction I think you described it.

Within ten days he's in a physical therapy appointment where's he's complaining of numbness in his hands and in the palmar surface of fingers and then into his hand and that he had no prior problems, never experienced any numbness in his hand or fingers.

What do you think the likelihood is that that just coincidentally happened and didn't have any relationship to the accident and the impact?

A. It's very unlikely it wasn't related. Can I make another comment?

Q. Sure.

A. Because I'm getting a little bogged down by the whole traction thing which we're believing and saying, but for all we know even if he put his hand forward and pushed his arm back like this suddenly that is also going to do nerve damage. So you don't necessarily have to be holding onto something, there are many ways in a car accident that the nerve can be damaged.

Q. Okay. Alright. And I'm glad you brought that out. And just [to] make sure I got your answer to my other question is, is given all the facts and surrounding how they came down, he didn't have prior problems, he was in the accident, it was within ten days he's complaining of this, how likely is it that if there never was an accident that then on November 3rd, 2008 he would say, oh, I have some numbness in my fingers and hand, how likely is that?

A. Given everything, I don't think it's very likely. I mean I think the whole scene of events all matches up.

[¶ 48] As is apparent from their testimony, the question on which Drs. Jost and Kummer were crosswise was not whether the collision was forceful enough to cause Plaintiff's injuries. Neither physician focused her opinion on the speed of the vehicles, the suddenness of the braking, or the force of the impact. Where the opinions differed was on when symptoms or signs of injury would appear if the injury were in fact sustained in the accident. The emotional context of the accident did not factor into the opinions on causation. We therefore agree with the district court's assessment that the circumstances of the accident were of marginal relevance and their potential for unfair prejudice certainly outweighed their probative value. The court did not abuse its discretion in limiting the evidence as it did.

### B. *Admission of Evidence of Plaintiff's Tobacco and Alcohol Use*

[¶ 49] The district court permitted Defendants to introduce evidence that Plaintiff smokes one pack of cigarettes per day and drinks a six-pack of beer per day. In so ruling, the court reasoned as follows concerning evidence of Plaintiff's smoking:

The Court finds that based on the offer of proof Dr. Skene is prepared to testify that he recommended as part of his treatment for the plaintiff that he was to quit smoking and we've heard from Dr. Skene that part of that—part of his motivation for doing that was that it interferes with the healing process in addition to just being better for your overall health.

Under Rule 402 relevant evidence should be admitted and any evidence that makes—has any tendency to make a fact that is of consequence to the determination of the action more or less probable is admissible. The Court does not find this to be more—the Court does not find the probative value is exceeded unduly by its prejudicial effect because we're talking about complaints here by the plaintiff for damages that include loss of enjoyment of life, pain and suffering and that those dam-

ages will depend in part upon the determined life expectancy and also those damages [depend] in part upon when the pain resolves and apparently there's unresolved pain and there's a causal connection there between the recommendation being made that he quit smoking by Dr. Skene and the interference with the healing process.

[¶ 50] Concerning its admission of evidence of Plaintiff's alcohol use, the district court explained:

The parties have stipulated to, as I understand it, the life expectancy pattern instruction that says in considering life expectancy you can consider the average life expectancy in connection with other evidence related to the probable life expectancy including evidence of occupation, health, habits, activities, bearing in mind, et cetera.

So lifestyle evidence is relevant to life expectancy. There's already been a medical nexus drawn between general health and smoking and it's within the ken of the average person that, you know, drinking—a person's drinking habits may influence their life expectancy.

[¶ 51] We find that evidence of Plaintiff's alcohol and tobacco use was relevant in light of the future damages sought by Plaintiff and the jury instructions regarding those damages. Through Instruction No. 16, the jury was instructed as follows on its consideration of Plaintiff's life expectancy as a factor in determining future damages:

In the event you find that Mr. Stocki is entitled to damages arising in the future, you may consider how long Mr. Stocki is likely to live.

Mr. Stocki is 34 years old. A person aged 34 years is expected to live, on average, another 43.8 years, for a total of 77.8 years. This figure is not conclusive. You may consider this in connection with other evidence relating to the probable life expectancy of Mr. Stocki, including evidence of his occupation, health, habits, and activities, bearing in mind that some persons live longer and that some persons live less than the average.

[¶ 52] Plaintiff does not challenge the giving of this instruction. He instead contends the district court abused its discretion in allowing evidence of his alcohol and tobacco use because Defendants' evidence did not quantify, through expert testimony or otherwise, a probable impact, in terms of years, that Plaintiff's tobacco and alcohol use would have on his life expectancy. We disagree that such a level of precision is required.

[¶ 53] On its face, Instruction No. 16 acknowledges that the jury is being required to work with a longevity estimate that is an average and not particular to Plaintiff. We find it a difficult proposition that in order for the jury to consider evidence that is specific to Plaintiff and his lifestyle, habits, and health, that such evidence must be presented to the jury with a corresponding quantifiable impact. In fact that is not how this Court has historically viewed a jury's determination of life expectancy.

[¶ 54] This Court has recognized that a jury draws not only on evidence but also on its own knowledge and experience in estimating an injured individual's life expectancy. *Glover v. Berger*, 72 Wyo. 221, 263 P.2d 498, 509 (1953). In *Glover*, the Court upheld the admission of a physician's testimony regarding the plaintiff's life expectancy that deviated from accepted mortality tables. *Id.* In so ruling, the Court held that such tables are not required to prove life expectancy. *Id.* It reasoned:

The witness was not cross-examined as to his knowledge of 'present day medical statistics' to which he referred or what those statistics disclosed. But in this connection we call attention to the following utterances of the courts and text statements. In *S.A. Gerrard Co. v. Couch*, 43 Ariz. 57, 29 P.2d 151, 155 [(1934)], the court said:

'The text in 17 Corpus Juris 875, § 181, states the rule as follows: 'Where the permanency is controverted, the mortality tables may be admitted to be considered by the jury in case they find that the injury is permanent. Direct evidence as to plaintiff's expectancy of life, however, is not essential, but the jury may determine such fact from their own knowledge and from the proof of the

age, health, and habits of the person and other facts before them.' Couch's age was not proved, but at the time he was employed as a pile driver, at a salary of $5 per day, and must have been in reasonably good health. By observation of his appearance the jury could estimate approximately his age and life expectancy.'

*Glover*, 263 P.2d at 509.

[¶ 55] While there may be conditions that impact life expectancy in a way that is beyond the understanding of a lay person, we agree with the district court that the impacts of smoking and alcohol use are within the ken of the average person. This distinction was explained in *Kraus v. Taylor*, 710 A.2d 1142, 1144 (Pa.Super.Ct.1998), where a Pennsylvania court distinguished between evidence of alcohol use and cirrhosis of the liver. The court held that evidence of chronic drug and alcohol abuse was admissible because it "suggests that [the plaintiff's] life expectancy deviates from the average." *Kraus*, 710 A.2d at 1144. The court distinguished a ruling upholding the exclusion of evidence of a decedent's cirrhosis, reasoning that that evidence differs from alcohol abuse because "the effect of cirrhosis on life expectancy is not within the ken of the average layman and therefore requires expert testimony to be admissible." *Id.; see also Sheehan v. Pima County*, 135 Ariz. 235, 660 P.2d 486, 490 (Ariz.Ct.App. 1982) (upholding admission of evidence that decedent had been a heroin addict and smoked marijuana once or twice a couple of years before death as relevant to earning power and life expectancy); *Century '21' Shows v. Owens*, 400 F.2d 603, 610 (8th Cir. 1968) (upholding admission of evidence of occasional alcohol use where "drinking habits might have some bearing on [the plaintiff's] longevity"); *McIlwaine v. Metropolitan S.R. Co.*, 74 A.D. 496, 77 N.Y.S. 426, 427 (1902) (effects of alcohol use are "common knowledge" and "great latitude should be allowed in the presentation of evidence that may aid the jury in the determination of [future damages]").

[¶ 56] Plaintiff's use of tobacco and alcohol were relevant considerations in determining life expectancy as the jury was instructed

under Instruction No. 16. Moreover, as the district court observed, Plaintiff's treating physician had testified to the harmful effects of smoking generally and to its detrimental impact on healing. We therefore find no abuse of discretion in the district court's admission of evidence relating to Plaintiff's tobacco and alcohol use.

### C. *Mitigation of Damages Instruction*

[¶ 57] Instructions Nos. 8 and 18 instructed the jury on mitigation of damages. Instruction No. 8 addressed the parties' respective burdens of proof and instructed, in part:

> The Defendants have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove that Plaintiff failed to take reasonable steps to reduce his injuries and damages.

[¶ 58] Instruction No. 18 addressed mitigation only and instructed:

> A person has the duty to take reasonable steps under the circumstances to reduce his injuries and damages. Any damages resulting from a failure to take such reasonable steps cannot be recovered.

[¶ 59] Plaintiff contends that the district court erred in providing the jury these instructions, arguing 1) the instructions were inadequate; 2) there was no evidence to support giving the instructions; and 3) Defendants waived the affirmative defense of mitigation when they failed to fully respond to Plaintiff's discovery responses. We will address each argument in turn.

#### 1. *Adequacy of Instruction*

[¶ 60] Plaintiff argues that the mitigation instructions were inadequate because "[r]ather than identify the actual factual basis of the Defendants' affirmative defense, Jury Instructions 8 and 18 invite the jury to speculate on any perceived failures to mitigate it might come up with." Plaintiff cites no authority for the proposition that a jury instruction should contain the factual basis for the jury's application of the law, and the argument is in fact at odds with the manner in which this Court has held a jury is to be instructed. Instructions are to provide the jury with a clear statement of the law

and are not to invade the jury's fact-finding province, as is illustrated by our direction in responding to jury questions during deliberation:

Juries' legal questions, which are what usually prompt supplemental instructions, differ fundamentally from their factual questions for an obvious reason: juries do not serve as the "triers of law." They are not expected to divine the law for themselves the way they are expected to find the facts. Rather, the trial judge, aided by counsel, provides the jury with the proper legal standard. Indeed, when a jury makes explicit its legal difficulties a trial judge should clear them away with concrete accuracy.

By contrast, where a jury's questions relate to a factual matter, a substantive reply (whether by the judge or the attorneys) risks interfering with the jury's exclusive responsibility for resolving factual questions. For this reason, several circuits have upheld district courts that refused to answer juries' factual questions[.]

*Brown*, ¶ 44, 340 P.3d at 1032 (quoting *Snow v. State*, 2009 WY 117, ¶ 31, 216 P.3d 505, 515 (Wyo.2009)).

 [¶ 61] For these reasons, we reject Plaintiff's argument that the mitigation instructions should have contained a factual basis for the affirmative defense. Additionally, we have stated that the following is a correct statement of the law when instructing on mitigation:

A person has the duty to take reasonable steps under the circumstances to reduce his or her injuries and damages. Any damages resulting from a failure to take such reasonable steps cannot be recovered.

*McWilliams v. Wilhelm*, 893 P.2d 1147, 1148 (Wyo.1995).

[¶ 62] The mitigation instructions given in this case were stated in terms nearly identical to the instruction we approved in *McWilliams*. The instructions were thus a correct statement of the law, and we find no error in the instructions themselves. We turn then to the question of whether there was sufficient evidence in the record to support the court's decision to give the instruction.

## 2. *Evidentiary Support for Mitigation Instruction*

[¶ 63] Plaintiff argues that Defendants failed to provide a reasonable basis for determining the damages caused by a failure to mitigate, and the instruction therefore should not have been given. We disagree that the evidentiary support was not sufficient to support the instruction.

 [¶ 64] We have held as follows concerning the evidence required to support a mitigation instruction:

Appellees were not required to offer evidence detailing the exact extent to which appellant failed to mitigate his damages. *Douglas Reservoirs Water Users Ass'n v. Cross*, 569 P.2d 1280, 1284 (Wyo.1977) ("if there is evidence from which a reasonable estimate of money damages may be made[,] that is sufficient[.]"). They need only introduce enough evidence from which a jury could reasonably conclude that appellant failed to mitigate to enable them to arrive at a damage award. *Wyoming Wool Marketing Ass'n v. Woodruff*, 372 P.2d 174, 181 (Wyo.1962) ("It is sufficient if there is evidence which furnishes a basis from which a reasonable estimate of the money damage may be made.").

*McWilliams*, 893 P.2d at 1149.

[¶ 65] This Court has addressed the sufficiency of evidence to support a mitigation instruction where the alleged failure to mitigate related to the injured party's ability and efforts to return to work. *See Weaver v. Mitchell*, 715 P.2d 1361, 1364 (Wyo.1986). In *Weaver*, we upheld a district court's refusal to give a mitigation instruction, explaining:

During the time [defendants] claim [plaintiff] could have worked to mitigate damages, he was engaged substantially full-time in a rigorous physical therapy program to strengthen his injured leg. There was medical testimony that the exercise program was required by a doctor and was beneficial to him. This resulted in reducing damages for which [defendants] might otherwise have been liable. [Plaintiff] progressively gained strength and en-

durance as a result of the rehabilitation program. From this [defendants] infer that [plaintiff] could have, and should have, become gainfully employed in order to minimize damages. This inference is not sufficient to overcome the direct testimony that the exercise program was required by the doctor, and that the program was substantially full-time and was, in fact, successful.

[Plaintiff's] ability to work was only inferred, and there was no evidence that there was opportunity for him to obtain employment or that he unreasonably refused employment. [Defendants] failed to meet their burden of proving that [plaintiff] could have mitigated damages.

*Weaver,* 715 P.2d at 1364.

█ [¶ 66] In contrast, in this case, Defendants presented the testimony of Dr. John Janzen, a rehabilitation specialist in the field of vocational and psychological rehabilitation. Dr. Janzen testified that he completed a disability evaluation of Plaintiff and also researched the labor market in the area where Plaintiff resides. Based on his evaluation of Plaintiff and labor market research, Dr. Janzen described the jobs he found Plaintiff qualified and able to perform and then testified to the following opinions:

A. My opinion is that he has not sustained a reduction or a loss in earning capacity in the sense that he is able to qualify for employment that's at a wage commensurate or higher than what he earned in the construction industry.

Q. If Mr. Stocki were to pursue some other lines of work as you mentioned what kind of income would he be capable of earning?

A. Well, he would really be looking at a range and I used a median range, which is a midrange, of anywhere from 19 to $29 an hour. This information comes for the wages of these occupations that I've just been discussing, that's published by the U.S. Bureau of Labor Statistics for this geographical area.

It's very important to note that there's detailed information that goes into coming up with these wages through the analysts that contact employers in this area to come up with the wages and I feel very confident that that would be a wage that he would qualify for.

Q. Is this level of income similar to what he was making at Buffalo Valley at the time of the accident?

A. Yes.

Q. Mr. Stocki's currently making $10 an hour as a cook, in your opinion is he earning the level of income that he is capable of earning?

A. No.

[¶ 67] On cross-examination, Plaintiff testified that he had not applied for the positions identified by Dr. Janzen and explained his reasons for not applying for those positions. Given the testimony of Dr. Janzen and Plaintiff, the record contained sufficient evidence for the jury to determine whether Plaintiff had taken reasonable steps to obtain employment comparable to this former employment, and for the jury to estimate the impact on damages of any failure to take those reasonable steps. The record thus supported the giving of the mitigation instruction, and we find no abuse of discretion in relation to the evidentiary support for the instruction.

### 3. *Waiver of Mitigation Defense*

[¶ 68] Plaintiff's final argument concerning the mitigation instruction is that the instruction should not have been given because Defendants did not provide adequate responses to Plaintiff's discovery requests related to that defense. Plaintiff presented this argument in a motion in limine filed October 22, 2013, approximately two weeks before trial. The district court responded:

I guess my question is why that wasn't taken care of in discovery?

. . . .

And I didn't see a motion to strike the affirmative defense and so all the sudden at the last minute I get a motion in limine on this affirmative defense that should have been brought up in the course of discovery in a motion to compel or a motion to strike and in so far as that goes is should have been—I think it could have

been reasonably anticipated as a motion in limine in the timeline I put in my scheduling order for filing motions in limine could have been met on this issue.

But, you know, my problem, one of my big problems with it, is just that it's untimely. It should have been done in the course of discovery in a motion to compel and/or a motion to strike and/or an earlier motion in limine.

[¶ 69] The district court reserved ruling on whether to give a mitigation instruction until the evidence was in and at that point, when it determined that the evidence did support giving the instruction, it overruled Plaintiff's waiver objection. Plaintiff's claim that the court erred in this ruling is essentially a claim that the court erred in enforcing its pretrial schedule and in denying Plaintiff's requested discovery sanction. We review such claims for an abuse of discretion. *See Bratton v. Blenkinsop (In re Bratton),* 2014 WY 87, ¶ 22, 330 P.3d 248, 253 (Wyo. 2014) (trial court has broad discretion in enforcing its scheduling orders, and rulings will not be reversed unless court acts unreasonably under the circumstances); *Black Diamond Energy, Inc. v. Encana Oil & Gas (USA) Inc.,* 2014 WY 64, ¶ 43, 326 P.3d 904, 915 (Wyo.2014) ("A district court is generally afforded broad discretion, both in the mechanisms adopted to control discovery and in its selection of appropriate sanctions for violations of discovery.").

[¶ 70] The district court entered a scheduling order on January 15, 2013, which scheduled a pretrial conference for July 19, 2013 and which set a discovery cut-off date of May 31, 2013 and a motions deadline, including motions in limine, of thirty days before the pretrial conference. Plaintiff did not file a motion to compel on his mitigation discovery or a motion to strike Defendants' affirmative defense, and he waited until approximately two weeks before trial to file his motion in limine seeking a ruling that Defendants had waived the mitigation defense. Given these circumstances, we cannot say the district court acted unreasonably in denying the motion, and we find no abuse of discretion in the court's ruling.

## D. *Verdict Form*

[¶ 71] The district court refused Plaintiff's proposed verdict form, which broke out damages into six categories, and instead used a verdict form that asked the jury first for its finding on causation and then one damages question: "What amount of money do you find will fairly compensate Mr. Stocki for the injuries and damages he has suffered and will suffer in the future as a result of this accident?" Plaintiff claims the district court abused its discretion in refusing his verdict form and in using a form that he argues made it impossible to determine any irregularities in the verdict and likely encouraged the jury to arbitrarily choose a round number for damages based on guesswork rather than the evidence. We disagree and find no abuse of discretion.

[¶ 72] When this Court reviews a verdict form, we must consider it conjunction with the instructions. *Pauley v. Newman,* 2004 WY 76, ¶ 12, 92 P.3d 819, 824 (Wyo.2004). Included in the instructions given in the present case was Instruction No. 14, which set forth and defined the elements of damages. Paraphrasing, Instruction No. 14 identified as the claimed elements of damages: a) pain, suffering, and emotional distress (past and future); b) disfigurement; c) loss of enjoyment of life (past and future); d) loss of earnings and earning capacity; and e) medical expenses (past and future). Plaintiff's verdict form did not use the same categories of damages, and in particular provided one category that combined damages for pain, suffering, emotional distress, "his disabilities," and loss of enjoyment of life. This category of damages was listed twice on the verdict form, once for damages to date and then a second time for future damages. "Disabilities," as an element of damages was not defined in Instruction No. 14 or elsewhere, and its inclusion in a verdict form would likely lead to confusion. This is particularly true since Plaintiff's proposed verdict form also included a separate element of damages for lost earning capacity.

[¶ 73] Because Plaintiff's proposed verdict form would likely lead to confusion when considered along with Instruction No. 14, we

find no abuse of discretion in the district court's rejection of that form. We turn then to whether the general form the court did use was adequate.

[¶ 74] In *Turcq v. Shanahan*, 950 P.2d 47 (Wyo.1997), this Court addressed a similar claim of error in the use of a verdict form that did not itemize general and special damages. In that case, the plaintiff, an animal control officer, suffered several bite injuries to her head and jaw when she tried to place a dog into her vehicle. *Id.* at 50. As a result of those injuries, the plaintiff sought damages for: past and future medical care; past and future mental and emotional pain; past and future loss of enjoyment of life; past and future loss of wages; permanent disfigurement and disability; and an impaired earning capacity. *Id.* at 52. The defendant appealed the trial court's refusal to itemize damages and this Court found no abuse of discretion:

> The rationale supplied by the trial court for the special verdict form which encompassed only past medical expenses and future medical expenses, involved two propositions. First, the damages for past medical expenses were stipulated to be $5,997, and the district court wanted to insure that the jury would not award any amount beyond that figure. Second, the trial court was in doubt as to whether Shanahan had adequately established future medical expenses, and wanted to reserve judgment on that issue, pursuant to WYO. R. CIV. P. 50, if the jury found future medical expenses. In this particular instance, we discern no abuse of discretion on the part of the trial court in refusing to require itemization of general damages or other special damages on the verdict form.

*Turcq,* 950 P.2d at 53.

[¶ 75] We find nothing to distinguish the present case, and we are not persuaded by Plaintiff's argument that the rounded damages award is evidence of a verdict irregularity that can be attributed to

the verdict form. First, we presume that a jury follows the instructions it is given. *Moore v. State,* 2013 WY 120, ¶ 17, 309 P.3d 1242, 1246 (Wyo.2013). Second, it is pure speculation to suggest that it was the verdict form that caused a rounded figure for the jury's damages award. We find it far more likely that this could be attributed to the manner in which Plaintiff cast his damages in his closing argument, requesting: $66,000 for past medical expenses; $10,000 for future medical expenses; $20,000 to $40,000 for lost wages; $50,000 for lost earning capacity; and an amount for pain and suffering that is not discernible from the record but was greater than $30,000.[2]

[¶ 76] For these reasons, we find no abuse of discretion in the verdict form ordered by the district court.

### E. *Exclusion of Inflation Rate Evidence and Instruction on Present Value*

[¶ 77] Plaintiff's challenge here is really two separate but related questions. First, Plaintiff argues that the district court should have admitted the inflation graphs and charts offered by Plaintiff to assist the jury in determining present value. Second, Plaintiff argues that in the absence of that evidence, there was no evidentiary basis to support a present value instruction. We again address each of these arguments in turn.

#### 1. *Inflation Graphs and Charts*

[¶ 78] The district court excluded the inflation graphs and charts offered by Plaintiff, explaining:

> It's a slightly different analysis on the inflation [evidence]. The graphs I felt that talked about that showed different inflation was—were from 2008 to 2013 and that's incomplete as it relates to the future. And the charts themselves that were produced, the data sets, I wouldn't admit those without further foundation because I don't believe they are self-explanatory. I think they are confusing and misleading.

---

2. We cannot discern this amount because while Plaintiff's counsel argued he felt the amount should be more than the $10,000 to $30,000 Defendants suggested for pain and suffering, the

record indicates that Plaintiff's counsel then wrote a figure for the jury's consideration. That figure apparently was not spoken out loud and was therefore not transcribed.

And I just—I think they're excludable under 403 standing alone because their probative value—to the extent that there's probative value there it's exceeded by its prejudicial effect because of just basic confusion. I looked at those and my eyes kind of crossed and went blurry and I don't believe—I think, [Plaintiff's Counsel], you asserted that, you know, certainly a person can look at that and understand it and I would have to disagree without further expert testimony about that. I just don't think that's admissible.

[¶ 79] This Court has reviewed the proffered inflation evidence, which consisted of two graphs, which covered the period indicated by the district court, and a table, which was close to twenty pages long and entitled "Consumer Price Index for All Urban Consumers (CPI–U): Regions, semiannual averages, by expenditure category and commodity and service group." Based on that review, we concur with the district court's concerns and find no abuse of discretion in the exclusion of the evidence. Unfortunately, we have this same concern with the present value instruction, which we address next.

### 2. *Present Value Instruction*

[¶ 80] Defendants requested that the jury be given an instruction on reducing damages awarded for future damages to their present value. The district court gave Defendants' requested instruction, changing it only to add a sentence concerning the effects of inflation. Instruction No. 17 instructed:

In determining damages for medical expenses and lost earning capacity that will be incurred in the future, you must determine the present worth in dollars of such future damages.

A lump sum of money received today is worth more than the same sum paid in installments over a period of months or years because a sum received today can be invested and earn money at current interest rates. By making a reduction for the earning power of money, your answer will reflect the present value in dollars of compensation for future damages.

In computing the amount of future damages, you may take into account the effects of inflation.

[¶ 81] Plaintiff objected to Instruction No. 17, arguing that Defendants had offered no evidence that would allow the jury to make a present value calculation. In overruling Plaintiff's objection, the district court commented:

Okay. And the record will show that the Court considered the pattern instruction, in particular the cited authority for the instruction *Weaver versus Mitchell*, 715 P.2d 1361. The parenthetical in the note there is, "Failure to give this instruction does not constitute error where an expert witness reduces the projected loss of earnings to present value and explains this principle to the jury."

That infers that this pattern instruction may be given without the requirement of the expert testimony and I was not presented any authority that giving that instruction in the absence of expert testimony was error so that's why I gave that.

[¶ 82] While the parenthetical note quoted by the district court accurately summarized the holding in *Weaver*, we disagree with the court's extension of that holding. In *Weaver*, the defendants asserted error in the trial court's refusal to give a present value instruction. *Weaver*, 715 P.2d at 1367. We found no error because the plaintiff's economist had already reduced plaintiff's damages to their present value. *Id.* In other words, there was no need to give the present value instruction, because there was no need for the jury to calculate present value. *Id.* Contrary to the district court's interpretation, *Weaver* did not address the evidence required to support a present value instruction.

[¶ 83] *Weaver* did not address the evidence required to support a present value instruction, but generally speaking, "[b]efore any instruction can be given, there must be evidence before the jury to which it may apply the rule of law encompassed by the instruction." *Wyo. Med. Ctr., Inc. v. Murray*, 2001 WY 63, ¶ 14, 27 P.3d 266, 269 (Wyo.2001). In this case, there was no evidence of the applicable interest rates or evidence of how a present value calculation is

made. In other words, there was no evidence from which the jury could calculate the present value of future damages. We do not hold that expert testimony is the only type of evidence that will support the giving of the present value instruction, but there must be at least some evidence that will enable the jury to make the calculation. *See Gallegos v. Dick Simon Trucking, Inc.*, 2004 UT App 322, ¶ 11, 110 P.3d 710, 714 (Utah Ct.App. 2004) (present value calculation almost impossible without evidence to aid the jury in calculation); *Baublitz v. Henz*, 73 Md.App. 538, 535 A.2d 497, 502 (Md.Ct.Spec.App.1988) (no error in refusing present value instruction where no evidence as to its proper application); *Barrett v. Landis*, 281 Or. 433, 575 P.2d 154, 157 (1978) ("To instruct the jury without any evidence of the ingredients of the formula could do nothing more than confuse the jury.").

[¶ 84] Defendants contend that Plaintiff bore the burden of proving damages and thus if the record contains insufficient evidence to support the present value instruction, that deficiency is attributable to Plaintiff and not one he can assert as error on appeal. We disagree. We have addressed respective burdens of proof regarding damages, holding:

> Although generally the plaintiff in an action for damages has the burden of establishing the damage which resulted from the defendant's [tortious act or] breach of contract, it is the defendant who has the burden of establishing matters asserted in mitigation or reduction of the amount of the plaintiff's damages.

*Veys v. Applequist*, 2007 WY 60, ¶ 27, 155 P.3d 1044, 1052 (Wyo.2007) (quoting 22 Am. Jur. 2d *Damages* § 708 (2003)); *see also* 22 Am. Jur. 2d *Damages* § 724 (2013) (renumbered version of section quoted in *Veys* ).

[¶ 85] Defendants requested the present value instruction to reduce the amount of Plaintiff's damages, and it was their burden to present evidence to support the instruction. Because that evidence was not presented, it was error to give the jury a present value instruction. This does not, however, end our inquiry. An error in instructing the jury is not reversible error

unless the error is prejudicial, meaning the instruction confused or mislead the jury. *Brown*, ¶ 40, 340 P.3d at 1031.

[¶ 86] In determining whether there was prejudicial error, we must consider how the improper instruction affected the jury's ability to calculate damages. In that regard, we must consider that the present value instruction applied to only a narrow aspect of Plaintiff's damages. By its terms, the present value instruction applied to only future medical expenses and lost earning capacity. Based on the record before us, and in particular Plaintiff's evidence concerning future medical expenses and lost earning capacity, we do not find prejudicial error.

[¶ 87] Proof of future medical expenses requires a showing that it is more likely than not that the injured party will require future medical treatment. *Rudy v. Bossard*, 997 P.2d 480, 485 (Wyo.2000). In requesting these damages from the jury, Plaintiff's counsel argued:

> His future expenses, you know what it's kind of an X factor, it's kind of hard to say what those are going to be. He's going to have medication, he's going to have trigger point injections, we don't know how long that will be. It could be the next five years, it could be the next 20 years, it could be the next 40 years.
>
> I think $10,000 is reasonable for that, that way if he's having a problem 20 years from now maybe he's able to know he will [be] able to deal with it. And if all he's going to have is medication maybe if you gave him $10,000 right now and he put it in a CD he was invested in maybe that would be enough, maybe it wouldn't. This isn't my decision, this is your decision.

[¶ 88] The uncertainty with which Plaintiff expressed his future medical expenses is consistent with the medical testimony. Dr. Skene, who treated Plaintiff for his soft tissue injuries to his back and neck, testified that the last trigger point injection he gave Plaintiff was in August 2010, and he has not seen Plaintiff since August 2010. Dr. Skene also testified that patients with these soft tissue injuries have a fairly high recovery

rate. Dr. Skene did not provide an opinion regarding future medical expenses.

[¶ 89] Dr. Jost treated Plaintiff for his right arm nerve damage. Regarding future medical expenses, she testified that the last time she saw Plaintiff was in May 2013. Regarding Plaintiff's future dependence on medication, Dr. Jost testified:

Q. Okay. And in your opinion if those medications are helping him how much longer do you think he's going to need to stay on those medications?

A. Sometimes indefinitely.

Q. Okay. Is that for sure? I mean are we talking lifetime of medications or would you be hopeful that maybe sometime he wouldn't still be on those medications?

A. We have no idea.

[¶ 90] Plaintiff presented his request for damages for lost earning capacity with a similar uncertainty:

So lost earning capacity. You know, the thing about Jerry is he's not that educated, he doesn't have a lot of skills, and I think he tested poorly on some things Dr. Janzen was testing him on. I think you should consider that in looking at his ability to get these other jobs.

But you know what, if he can get a better job he's going to go for it, I can guarantee it. And so maybe he gets a better job, maybe he's not able to get a better job. I would put a figure on his lost earning capacity of $50,000, they've taken away his ability to work as a carpenter and he's working as a cook now, where that goes in the future we don't know for sure, we're going to be positive, but I think that's a reasonable amount. It could be more than that, it could be less.

[¶ 91] Again, the evidence supports Plaintiff's reticence in requesting damages for lost earning capacity. Dr. Janzen testified that Plaintiff was underemployed and had no loss of earning capacity. Plaintiff did not present expert testimony to refute Dr. Janzen's opinions and the only evidence Plaintiff presented concerning his earning capacity was the opinion of Dr. Jost that Plaintiff could not return to carpentry and Plaintiff's own testimony concerning his capacity.

[¶ 92] Given the dearth of evidence on future damages, it is unlikely the present value instruction was a factor in the jury's determination of damages, and on such a record we cannot find prejudice in the district court's error in giving the present value instruction. Thus, while we find that the district court erred in giving the present value instruction, we do not find reversible error.

### F. *Prejudgment Interest*

[¶ 93] Following the jury's verdict, Plaintiff submitted a proposed judgment. The proposed judgment asserted (footnotes omitted):

3. Defendants' liability insurer was presented with a demand for medical expenses in the amount of $49,828.62 on February 22, 2011. Of this amount, Plaintiff presented $48,528.62 of these expenses to the jury.

4. Plaintiff is entitled to prejudgment interest on these amounts at the statutory rate of 7% per annum from the date the expense was presented until the date of the verdict. This amount totals $9,198.18.

[¶ 94] On January 21, 2014, the district court entered its Judgment upon Civil Jury Trial, which order stated that Plaintiff is not entitled to an award of prejudgment interest. In a subsequent order on post-trial motions, the court explained that it denied prejudgment interest because it was impossible to tell from the jury's verdict what portion of the award was attributable to the medical expenses Plaintiff presented to the liability insurer. In so ruling, the court pointed out that even if Plaintiff's proposed verdict form had been used, the form did not separate out an award for those medical expenses that had been paid and presented to the insurer for payment. Plaintiff claims error in this ruling.

[¶ 95] "[T]he question of whether the trial court is entitled to award prejudgment interest in a particular case is a question of law that we review *de novo*, while the question of whether prejudgment interest should be awarded is reviewed for an abuse of discretion." *Jensen v. Milatzo–Jen-*

*sen*, 2014 WY 165, ¶ 21, 340 P.3d 276, 282 (Wyo.2014) (quoting *KM Upstream, LLC v. Elkhorn Constr., Inc.*, 2012 WY 79, ¶ 44, 278 P.3d 711, 727 (Wyo.2012)). Whether prejudgment interest is available is determined by a two-part test: (1) the claim must be liquidated, as opposed to unliquidated, meaning it is readily computable via simple mathematics; and (2) the debtor must receive notice of the amount due before interest begins to accumulate. *KM Upstream*, ¶ 45, 278 P.3d at 727 (citing *Bowles v. Sunrise Home Ctr.*, 847 P.2d 1002, 1005–06 (Wyo.1993)).

[¶ 96] We find no error in the district court's ruling. It is not possible to determine from the jury's verdict what portion of the medical expenses that were readily computable and presented to the insurer was also included in the award.[3]

### G. *Denial of Sanctions for Defendants' Violation of Mediation Confidentiality*

[¶ 97] Following entry of the district court's judgment, Plaintiff filed a certificate of costs. Plaintiff requested total costs of $6,954.08, which included costs of $408.33 for Plaintiff's portion of the court-ordered mediation. Defendants objected to payment of Plaintiff's mediation costs, and in so objecting disclosed that "Plaintiff refused to make an offer at mediation below the combined policy limits of both parties of $200,000." Plaintiff then moved for sanctions for Defendants' violation of mediation confidentiality. The district court essentially agreed that Defendants had violated mediation confidentiality but denied sanctions, explaining:

This Court will not sanction Defendants' counsel under the circumstances because of at least a colorable argument that the possibility of bad faith negotiations at mediation was relevant to the question of whether the mediation fees would be considered a taxable cost. However, Defendants' counsel are strongly advised of the seriousness of breaching confidentiality regarding the course of mediation and cautioned that it would be most prudent to note such disclosures and the reasons or justification for them up front, along with any supporting argument, in any pleadings containing those disclosures.

[¶ 98] A district court has discretion in overseeing the conduct of court proceedings and imposing sanctions, and we review a district court's decision on sanctions for an abuse of discretion. *Northwest Bldg. Co., LLC v. Northwest Distrib. Co.*, 2012 WY 113, ¶ 18, 285 P.3d 239, 243 (Wyo.2012); *Dollarhide v. Bancroft*, 2010 WY 126, ¶ 4, 239 P.3d 1168, 1170 (Wyo.2010). Plaintiff contends that the district court abused its discretion by failing to consider sufficient factors relating to Defendants' violation when determining sanctions and then in denying sanctions. We find no abuse of discretion.

[¶ 99] In ruling on the motion for sanctions, the district court underscored the importance of confidentiality in mediation proceedings, and it admonished defense counsel to exercise greater caution in this matter. We certainly agree that the importance of maintaining mediation confidentiality cannot be overstated, and we expect litigants and courts to be mindful of the need for that confidentiality. In this case, though, the dis-

---

**3.** We make two additional observations. First, we note that as the record has been presented to this Court on appeal, the actual submission of medical expenses to the liability insurer was not attached to the proposed form of judgment—the form contained only an assertion of the amount that was submitted to the insurer. Additionally, the record does not contain copies of the exhibits submitted to the jury detailing the medical expenses Plaintiff was claiming as expenses. Thus the record itself does not contain a sufficient basis for this Court to separate out the liquidated damages that were presented to the insurer from the unliquidated damages. See *Jones v. Artery*, 2012 WY 63, ¶ 9, 275 P.3d 1244, 1247 (Wyo. 2012) (it is the appellant's responsibility to pro-

vide a record adequate to enable this Court's review). Second, we note that this Court has not previously recognized a claim for prejudgment interest in a personal injury action (on liquidated damages like past medical expenses), or had occasion to address that question, and we are not implicitly recognizing such a claim here. Because the record before the Court does not present us with a record that would allow a determination of liquidated damages, both because of record deficiencies and the form of the verdict, we do not view this as a proper case in which to address the question whether the common law should be expanded to allow prejudgment interest in personal injury actions or what the parameters of such a rule might be.

closure was not made to the jury, and it was not made until after the trial and verdict. The disclosure thus posed little danger of substantial prejudice to Plaintiff. Additionally, the district court had experienced the demeanor and approach of the attorneys involved in this case through pretrial, trial, and post-trial proceedings. It was clearly in the best position to judge defense counsel's intentions and to evaluate whether sanctions were necessary.

### H. Application for Mediation Fees as Costs

[¶ 100] The district court denied Plaintiff's application for costs in the amount of $408.33 for Plaintiff's portion of the court-ordered mediation costs. The court denied the costs on the basis that Plaintiff cited no Wyoming authority to support the application and on the basis that "the important policy of encouraging parties to attempt to settle cases through mediation would be frustrated if mediator fees were routinely awarded as taxable costs."

[¶ 101] We review a district court's ruling on an application for costs as follows:

> While the award of costs itself is reviewed for an abuse of discretion, the question of whether a particular cost provision applies requires construction of a court rule, which is a question of law that we review de novo. *Stewart Title Guar. Co. v. Tilden*, 2008 WY 46, ¶ 7, 181 P.3d 94, 98 (Wyo.2008); *see also Marx v. General Revenue Corp.*, 668 F.3d 1174, 1178 (10th Cir. 2011) (citations omitted) ("We review an award of costs for an abuse of discretion. Whether costs provisions even apply is a legal question reviewed de novo.").

*Weinstein v. Beach*, 2014 WY 167, ¶ 9, 340 P.3d 1013, 1016 (Wyo.2014).

[¶ 102] Mediation costs are not an allowable cost under U.R.D.C. 501(a)(3), and Plaintiff's reliance on U.R.D.C. 501(a)(4) is misplaced. Rule 501(a)(4) provides that a cost not enumerated in Rule 501 may be awarded if otherwise allowable under law. Plaintiff cites to no Wyoming authority allowing an award of costs for mediation costs,

and we therefore find no error in the district court's ruling.

### CONCLUSION

[¶ 103] We find no reversible error. The judgment of the district court is affirmed.